IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LUIS ROJAS BUSCAGLIA, INART
CORP., INART SERVICES, INC.

Plaintiffs,

v.                                             CIVIL NO. 13-1766 (FAB)

MICHELE TABURNO VASARHELYI,
also known as MICHELE TABURNO
VASARELY,

Defendant.

## REPORT AND RECOMMENDATION

## INTRODUCTION

Before the Court now is the second of a variety of dispositive motions presented in

the instant case, which has seen a long, tortured and bitter litigation process.  Co-Plaintiff

Luis Rojas ("Rojas") is a businessman dedicated to the purchase and sale of art. He owns

two corporations, Co-Plaintiffs Inart Corporation and Inart Services [1], which are dedicated

to the brokerage of art, and event planning and consulting, with emphasis on the works of

artists Victor Vasarely and his son Yvaral.  Defendant Michele Vasarely ("Vasarely" or

"Defendant") was married to Yvaral until his death, and at that time inherited a sizable and

valuable art collection from both artists.[2]

In 2010, Rojas, Inart and Vasarely signed an agreement (the "Agreement"), whereby

Rojas and Inart would sell certain pieces of art of the late artists belonging to Defendant.

Vasarely later moved to Puerto Rico on a non-immigrant working visa, and became an

---

[1] For the sake of clarity, hereinafter collectively "Plaintiffs".

[2] The reader can familiarize himself/herself more with the facts of this case, as detailed in the Court's previous
Report and Recommendation at Docket No. 190.

<u>Luis Rojas-Buscaglia, et al v. Michele Taburno-Vasarhelyi</u>
Civil No. 13-1766 (FAB)
Report and Recommendation
Page 2

employee of Inart Services.  That Agreement is, for the most part, the object of the present case.

Before the Court now are Defendant's Motion for Partial Summary Judgment (Docket No. 312), Plaintiffs' opposition thereto (Docket No. 333), and Defendant's reply to Plaintiffs' opposition (Docket No. 348).   In Defendant's Motion, she requests summary dismissal of almost all the claims brought by Plaintiffs in their Complaint, to wit: 1) alleged breach of the Agreement; 2) tortious interference with an installment sales contract (Horacio Campolieto); 3) tortious interference with a contract that allegedly prevented Plaintiffs from charging commissions for certain sales (Herman Leyba); 4) an order to produce certain certificates of authenticity; 5) personal defamation and damages; and 6) damages as a result of Vasarely breach of her employment contract with Inart.  After these claims are disposed of, Defendant states, only Count 7, an order for Vasarely to produce certificates of authenticity for two (2) artworks, *Quasar-Zett* and *Pompari*, would remain viable.

On January 30, 2015, the presiding district judge referred this Motion to the undersigned for a report and recommendation (Docket No. 315).  For the reasons explained below, it is recommended that Defendant's Motion for Partial Summary Judgment be **GRANTED IN PART and DENIED IN PART**.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997).  A fact is deemed "material" if it potentially could affect the outcome of the suit.  Id.  Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id.  At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); *see also*, Colón v. Infotech Aerospace Services, Inc., 869 F.Supp.2d 220, 225-226 (D. Puerto Rico 2012).  Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is

not—genuinely controverted.' " Hernández, 869 F.Supp.2d at 7 (*quoting* Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment.   A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).   If they so wish, they may submit a separate statement of facts which they believe are in controversy.   Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226. Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril." Hernández, 486 F.3d at 7.

## FINDINGS OF FACT

At the outset, the Court notes that Plaintiffs' opposition to Defendants' statement of uncontested material facts is procedurally non-compliant with the Local Rules.  Loc. R. Civ. P. 56 (c) specifically requires that the respondent either admit, deny, or qualify each of movant's proffered uncontested facts, and for each denied or qualified statement, the non-movant must cite the specific part of the record which supports the denial or qualification. If the non-moving party wishes, he can prepare its separate statement of issues of material fact which he deems are in controversy, and which preclude the entry of summary

judgment.  See Loc. R. Civ. P. 56 (c).  Plaintiffs failed to properly deny many of Defendant's proffered facts, as several of the denials, while they offered an explanation for the denial, were not supported by any record citation whatsoever.

As a second procedural matter, many of Plaintiffs' denials are also non-compliant insofar as many do not oppose the truth of the statement offered.  A review of Plaintiffs' qualifications of Defendant's factual statements shows they are either irrelevant to the matter, or consist of mere "speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of 'hot air.' " Eli Lilly and Co., 958 F.Supp. 721, 728 (D. P.R., 1997).  Others present mixed issues, saying, for example, that an issue was "admitted" but the "answer is qualified."  See, Defendant's proffered fact nos. 9, 10, and 23. Therefore, any factual matter not properly contested was deemed admitted.

Finally, the Court must mention that in opposing Defendant's Motion for Partial Summary Judgment, Plaintiff Rojas submitted a fourteen (14) page sworn statement, dated the same day the opposition to Defendant's Motion for Partial Summary Judgment was filed, precisely as a result of the issues raised in the motion.  Rojas' statement contradicts many of Defendant's proffered uncontested facts, one by one, with no evidence to sustain the contradictions, and in a clear attempt to create issues of material fact.  The First Circuit has refused, on numerous occasions, to allow issues of fact to be created simply by submitting a subsequent contradictory affidavit.  Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an

affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."); see also Torre-s v. E.I. DuPont De Nemours & Co., 219 F.3d 13, 20-21 (1st Cir. 2000); and Morales v. A.C. Orssleff's EFTF, 246 F.3d 32 (1st Cir. 2001).

In the case at bar, a writ of attachment hearing was held, which lasted seven (7) days, and where Plaintiff Rojas testified during five (5) of them.  On top of that,  Plaintiff was twice deposed in December, 2014, where he had ample opportunity to explain his answers and the factual basis for his claims.  His entire deposition testimony lasted close to twenty (20) hours, divided between two (2) days.  Having had generous time to express and explain all his claims and grievances, Plaintiff Rojas cannot come now, at the eleventh hour, and create issues of fact to oppose summary judgment.  Accordingly, the Court did not consider Plaintiff Rojas' declaration for purposes of this motion, and further, did not consider any of Plaintiffs' submitted uncontested facts that were premised on that declaration.

With this in mind, and pursuant to the parties' submissions, the Court deems the following facts uncontested.

1.  Luis Rojas is the sole stock-holder of Plaintiff corporations. He also holds all the positions as director and officer of said corporations. (See, D. Exhibit 1, p. 16-17, 21-22, and 26-27).

2.  Inart Corp. is a corporation duly authorized to do business under the laws of the Commonwealth of Puerto Rico as of February 14, 2008. Its purpose is to sell antiques and artwork. (See, D. Exhibit 1, p. 9-11).  It was cancelled by the Puerto Rico State Department on April 16, 2014.  www.estado.pr.gov.

3.     Inart Services is a corporation duly authorized to do business under the laws of the Commonwealth of Puerto Rico as of August 11, 2011. Its purpose is, also, to sell antiques and artwork. (See, D. Exhibit 1, p. 21-25).

4.     Vasarely is a French citizen, daughter in law of world re-known artist, Victor Vasarely, famous as the father of Op-Art.  She married Vasarely's son, Yvaral in 1969, and was widowed in 2002. As a result, Vasarely owns a large collection of Vasarely and Yvaral artwork. (See, D. Exhibit 2, p. 69).

### The 2010 Agreement

5.     In September 2010, the parties signed the Agreement in question, pursuant to which Inart, Corp. would "assist" Defendant Vasarely to sell artwork which "from time to time" she wished to sell. (See, D. Exhibit 3).

6.     Pursuant to that Agreement, Vasarely would consign with Inart a total of eleven (11) artworks, marked in the Agreement as Appendix A. (See, D. Exhibit 3).

7.     The final consignment ended up being eleven (11) paintings and three (3) sculptures. (See, D. Exhibit 3).

8.     As per clause 2 of the Agreement, once the consigned works were reduced to less than eight (8) pieces, Vasarely would supply additional works of similar kind and value to Inart. (See, D. Exhibit 3).

9.     As per clause 3 of the Agreement, Appendix A of the Agreement could only be amended in writing and upon signature of both parties. (See, D. Exhibit 3).

Luis Rojas-Buscaglia, et al v. Michele Taburno-Vasarhelyi
Civil No. 13-1766 (FAB)
Report and Recommendation
Page 8

10.   There is no written amendment to Appendix A. (See, D. Exhibit 5, p. 113).

11.   Rojas kept in his possession more than the eleven (11) agreed-upon works. (See, Docket 3-1).

12.   As per clause 6 of the Agreement, Inart had to prepare a written list of the artwork to be sold, with agreed upon prices with Vasarely.  Inart then had to send such list to Vasarely for her revision and/or approval. In exchange, Vasarely could approve immediately in writing or object. If no objections were received in writing within three (3) days, then, the list would be considered as fully approved by Vasarely. (See, D. Exhibit 3).

13.   There is only one written list of artwork sent by Inart, which was neither approved nor objected by Vasarely.  There is no evidence that Vasarely received any other lists with artwork for sale by Rojas, with proposed sales prices. (See, D. Exhibit 1, p. 319-322; see also, D. Exhibit 6, p. 114).

14.   As per clause 7 of the Agreement, payments of the "sale price" of the artwork "shall be made by the purchaser", as follows: 80% to Vasarely (or her corporation) and 20% to Inart.  Accordingly, Inart had to generate an invoice on the date of the sale and send a copy to Vasarely, with the name of the client and the purchase price. (See, D. Exhibit 3).

15.   Vasarely was copied only once on a sales invoice sent to clients. (See, D. Exhibit 5, p. 121).

16.   Vasarely asked that direct payments by the clients be made to her. (See, D. Exhibit 1, p. 357-360; D. Exhibit 7; D. Exhibit 8; and D. Exhibit 9).

17.   Usually clients paid the full price to Inart and Inart Services and then transferred moneys to Vasarely; only once was payment made directly to Vasarely through her company, Windsor Regency. (See, D. Exhibit 2, p. 30; and D. Exhibit 4, p. 62).

18.   On September 4, 2012, Rojas informed Vasarely about the sales price of various artworks. He informed her, however, of a so-called "base price", which was different from the final "sales price." (See, D. Exhibit 10; and D. Exhibit 11).

19.   On May 21, 2013, Vasarely requested of Rojas "for the last time", a full accounting of all sold artwork with a man named Herman Leyba. (See, D. Exhibit 12; and Exhibit 1, p. 408-410).

20.   On May 22, 2013, Vasarely requested an accounting report directly from Leyba. (See, D. Exhibit 13; and Exhibit 1, p. 408-410).

21.   On May 23, 2013, Leyba sent to Rojas and Vasarely a list of sold artwork, with prices and commissions for "Ideobox" and "Artley", from which Vasarely could appreciate a "base price" and "sale price" duality. (See, D. Exhibit 11).

22.   Before such joint email to both parties, on August 30, 2012, Leyba had sent to Rojas a list of sold artwork, including a "sale price", "base price" and

commissions for "Ideobox" and "Artley." (See, Email dated August 30, 2012, Exhibit 14).

23.    Rojas did not forward that list to Vasarely. Rather, on September 4, 2012, Rojas sent to Vasarely a list of sold artwork, informing her only of "base prices", as follows: (See, D. Exhibit 10).

| Artwork | Base price | 80% |
|---------|-----------|------|
| Boo | $490,000 | $392,000 |
| Tekers | $390,000 | $312,000 |
| Kerhon | $145,000 | $116,000 |
| Egsin | $15,000 | $12,000 |
| Axo | $13,500 | $10,800 |
| Moulin | $13,500 | $10,800 |
| Dyss | $4,000 | $3,200 |
| Vega | $4,000 | $3,200 |
| TOTAL | $1,075,000 | $860,000 |

24.    The real sales price of the sold artwork, as per the accounting sheet sent by Leyba, reflects as follows:

| Artwork | Base price | 80% |
|---------|-----------|------|
| Boo | $550,000 | $440,000 |
| Tekers | $440,000 | $352,000 |
| Kerhon | $170,000 | $136,000 |
| Egsin | $20,000 | $16,000 |
| Axo | $18,000 | $14,400 |
| Moulin | $18,000 | $14,400 |
| Dyss | $5,000 | $4,000 |
| Vega | $5,000 | $4,000 |
| TOTAL | $1,226,000 | $980,000 |

25.    On October 2012, Rojas sold, through Leyba, the artwork *Koska Nagy* for a "base price" of $380,000. (See, D. Exhibit 1, p. 381-383).

26. Vasarely's 80% over such sale amounts to $304,000.00. For purposes of the instant motion, she acknowledges having received payment over the "base price" of that artwork in full. (See, D. Exhibit 15, ¶15).

27. In March, 2013, Rojas sold *Separam, Emotta, Bala* and *Vega* for a "base price" of $390,500.00.  (See, D. Exhibit 1, p. 398).

28. Vasarely's 80% earnings for the sales of *Separam, Emotta, Bala* and *Vega* amount to $312,400.00.  She acknowledges receiving payment over the "base price" in full.  (See, D. Exhibit 15).

29. As per clause 8 of the Agreement, Vasarely would deliver a certificate of authenticity to Inart after payment in full of the sold artwork.  (See, D. Exhibit 3).

30. Vasarely keeps a log for the certificates of authenticity that she issues and she is very serious in this matter.  (See, D. Exhibit 5, p. 138; and D. Exhibit 19).

31. Vasarely keeps an extensive inventory of her artwork, including photographs for each artwork. (See, D. Exhibit 15, ¶¶1-3).

32. On October 5, 2010, Rojas sent to Vasarely an email with attached close-up pictures of the artwork *Tampico*. (See, D.  Exhibit 21).

33. The artwork that Rojas sold to Leyba was kept in his apartment, as he removed it from Vasarely's storage to show it to clients. (See, D. Exhibit 17, pp. 628-629).

34.   In October, 2013, Rojas sold *Triton* for a "base price" of $390,000.00. Vasarely has received nothing from this sale.  (See, Docket No. 11).

35.   Rojas knew Vasarely was trying to obtain information to prepare certificates of authenticity for some artwork sold through Leyba.  (See, D. Exhibit 5, p. 143).

36.   Rojas could not provide the information, since he did not take close up pictures of the artwork sold to Leyba.  (See, D. Exhibit 22, request #29).

37.   On October 8, 2013, Rojas wrote to Vasarely and requested from her the certificates of authenticity for the sold artwork.  She replied the following day, explaining that she would produce the certificates when Rojas deposited in her accounts all owed moneys; when he returned to her the artwork he kept in his apartment; when he returned her files and decorative ornaments; and, when he returned the artwork pertaining to a partial payment under the installment sales' agreement. (See, D. Exhibit 23).

38.   That same day and throughout the month of November 2013, Leyba wrote on various occasions to Rojas to see if he had paid Vasarely her share for the sale of *Triton*, so that his certificates of authenticity could be issued. (See, D. Exhibits 24-28; and D. Exhibit 5, p. 102-104).

39.   Since September 2013, Vasarely had been requesting Leyba to provide her the necessary information to prepare the certificates of authenticity. (See, D. Exhibit 29).

40. After exchanging pictures and information, on January 14, 2014, Vasarely sent to Leyba partially completed certificates of authenticity. (See, D. Exhibits 30-33).

41. Around February 19-20, 2014, Leyba sent to Vasarely, through counsel, an email with pictures and information regarding the artwork for which the certificates of authenticity were incomplete. (See, D. Exhibit 15, ¶11).

42. Vasarely was then able to prepare and send to Leyba fully completed certificates of authenticity. (See, D. Exhibit 15, ¶11).

43. On March 20, 2014, Leyba informed both parties that he had received in proper order the original completed certificates that Vasarely had sent on February 27, 2014. (See, D. Exhibit 34).

44. Under clause 9 of the Agreement, Inart was allowed to sell artwork through electronic catalogues and/or photographic images. But, if a client "absolutely requests" to see the artwork, then, the parties needed to jointly decide how to proceed. (See, D. Exhibit 3).

45. As per clause 10 of the Agreement, its duration was to be for one (1) year, renewable automatically for additional periods of one (1) year, unless otherwise stated in writing at least sixty (60) days prior to its expiration. (See, D. Exhibit 3).

46.   As per clause 11 of the Agreement, the Agreement could be terminated, for reasonable cause or for breach of contract, with eight (8) days notice.  (See, D. Exhibit 3,¶11).

47.   It could also be terminated with sixty (60) days written notice without just cause.  (See, D. Exhibit 3, ¶ 11).

48.   On January 20, 2013, Vasarely wrote to Rojas complaining that "you have not respected any of your agreements and you continue with your physical and emotional violence." She then requested that Rojas, among other things, return all her artworks in his possession, as well as the keys to her car, warehouses, and apartment.  (See, D. Exhibit 43).

49.   On March 14, 2013, Vasarely requested to Rojas a list of the artwork that he took from her storage units and the return of her keys.  (See, D. Exhibit 44).

50.   Rojas did not submit any such list. (See, D. Exhibit 15, ¶24).

51.   On April 7, 2013, Vasarely wrote to Rojas and explicitly informed him: "I no longer want to work with you."  (See, D. Exhibit 45).

52.   During the months of May and June, 2013, Vasarely wrote several times to Rojas to request him, again, the return of her keys, her artwork, her private documents, and her furniture.  She also requested information related to the sale of her properties and reinstated "we are not going to have any business until everything is clarified with attorneys and all my works of art are in my

possession." (See, D. Exhibits 46-49; see, also, D. Exhibit 42). Rojas did not respond to any of these emails. (See, D. Exhibit 15, ¶24).

53. Rojas admitted he kept a lot of Vasarely artwork under his control. (See, Docket No. 3-1).

54. Only with the Court Order issued in the instant case on January 30, 2014 did Plaintiffs return thirty-one (31) pieces of art to Defendant, listed in Exhibit A of Docket No. 3-1. (See, Docket No. 118-1).

55. Rojas still keeps *La Bergere*. (See, D. Exhibit 5, p. 58).

56. Rojas stated that Vasarely gave *La Bergere* to him as a "loan." (See, D. Exhibit 17, p. 548).

57. As per clause 12 of the Agreement, upon the termination of the Agreement, Inart had to return all artwork to Vasarely in forty-eight (48) hours by depositing it in the place designated by Vasarely.  If Inart failed to return the artwork within those forty-eight (48) hours, then Inart agreed to pay a fine of $1,000.00 per day.  (See, D. Exhibit 3).

58. Vasarely  terminated the Agreement on April 7, 2013 via the email of that same date, yet no artwork has been returned.  (See, D Exhibit 45).

59. The agreement requires that Inart provide "sufficient guarantees to Vasarely to ensure the safety and care of the paintings left in consignment."  (D. Exhibit 3, clause 15).

60. Rojas' keeps the artwork at his apartment.  (See, D. Exhibit 50, p. 131-132).

61.  Rojas admitted that the artwork he kept in his apartment (that he sought to attach) was worth over $10 million at private sales and close to $3 million in auction.  (See, D. Exhibit 5, p. 189-190).

62.  Rojas admitted he did not keep insurance to cover such an amount.  (See, D. Exhibit 5, p. 193).

63.  On October 12, 2013, a few days after filing the complaint in the present case, Rojas obtained insurance to cover the artwork for up to $2.4 million. (See, D. Exhibit 1, p. 231-232).

64.  Rojas admitted that the policy in place before that did not cover such an amount.  (See, D. Exhibit 1, p. 231-232).

65.  As a matter of fact, the policy for prior years apparently covered only $60,000. (See, D. Exhibit 51).

### Count II- Interference with installment contract (Campolieto)

66.  As per clause 9 of the Agreement, there shall be no installment sales unless Vasarely consents to all terms in writing.  (See, D. Exhibit 3).

67.  On August 26, 2012, Inart *Services*, not Inart Corp., in representation of Vasarely, signed an agreement with Mr. Horacio Campolieto for the sale in installments of the artwork *Gestalt Rugo* for the price of $390,000.00.  (See, D. Exhibit 35).[3]

68.  Vasarely was not a signatory to such agreement. (See, D. Exhibit 35).

---

[3] Judicial notice is taken that 20% of this amount equals $78,000.00.

69.     Vasarely requested Rojas a copy of this Agreement many times, but he did not

        supply it. (See, D. Exhibits 36-39; see, also, D. Exhibit 1, p. 289-291).

70.     The agreement allowed for payment in installments upon the signature of the

        agreement. As follows:

        a.       a payment of $60,000.00;

        b.      the transfer of a 2011 Mercedes Benz vehicle model E-350, valued at

                $60,000.00;

        c.      conveyance of an artwork by Melvin Martínez valued at $20,000.00.

        Additionally, the client would have to make twenty-five (25) monthly

        payments of $10,000.00 between the first and fifth day of each month,

        starting October 1, 2012.  (See, D. Exhibit 35; see also, D. Exhibit 2, p.

        108-110).

71.     In regard to the performance of letter "a" under the agreement (payment of

        $60,000.00), Rojas does not know how much moneys he paid to Vasarely.

        (See, D. Exhibit 1, p. 291-293).

72.     On August 27, 2012, Vasarely signed a letter authorizing Rojas to take all

        necessary action to transfer the Mercedes Benz vehicle to her name, yet on

        August 28, 2012, Rojas registered the Mercedes Benz under his name.  (See,

        D. Exhibit 40; D. Exhibit 41; and D. Exhibit 5, p. 163-164).

73.  Vasarely requested Rojas many times to register the car to her name, to no avail.  (See, D. Exhibit 42; D. Exhibit 36; and D. Exhibit 5, p. 165).

74.  During the pendency of the instant litigation, Rojas actually placed a lien on the vehicle.  While Plaintiffs' request to attach it had already been denied by the Court, Rojas did not seek leave of the Court to place a "litigation lien" over the vehicle.  (See, D. Exhibit 1, p. 305-306).

75.  Rojas tried to press charges against Vasarely for allegedly "misappropriating" the car.  (See, D. Exhibit 1, p. 307-308).

76.  In regard to the performance of letter "c" under the Agreement (artwork by Melvin Martínez), Rojas kept it.  (See, D. Exhibit 5, p. 168).  Rojas finally surrendered such artwork to Vasarely when the Court ordered it.  (See, Docket No. 118-1).

77.  In July, 2013, Rojas received a payment in the amount of $16,000.00, but he kept the full amount. (See, D. Exhibit 8; D. Exhibit 1, p. 303).

## Count III- Interference with contract (Leyba)

78.  Herman Leyba is an art dealer in Miami who does business through two (2) galleries/corporations: Ideobox and Artley.  (See, D. Exhibit 2, p. 12; D. Exhibit 4, p. 69-70; and D. Exhibit 1, p. 233-234).

79.  Rojas considers Leyba as his client, calling him alternatively a "broker" (¶ 46 of the Complaint) or a re-seller, since he knows Leyba is not the final purchaser.  (See, D. Exhibit 1, p. 233-234).

80. On August 16, 2010, Rojas sent to Leyba a list of artwork for sale generally, under the price of $100,000.00.  (See, D. Exhibit 52).

81. On August 18, 2010, Rojas sent an email to Leyba telling him that he (Rojas) was working on a "second proposal."  (See, D. Exhibit 53).

82. But during 2010, the sales never took place because of ongoing litigation regarding the Vasarely artwork.  (See, D. Exhibit 2, p. 43-45).

83. During the summer of 2012, Leyba and his clients gained new interest in the artwork, and the commercial relationship with Rojas was re-initiated.  (See, D. Exhibit 4, p. 58-59).

84. On July 31, 2012, Rojas sent to Leyba, a "proposal", with a list of prices for some Masterworks.  (See, D. Exhibit 54; see, also, Exhibit 6, p. 92-95).

85. On August 6, 2012, Rojas sent to Leyba an "inventory" list of small and medium size artwork.  (See, D. Exhibit 55; see also, D. Exhibit 6, p. 94-95).

86. On August 7, 2012, Rojas sent to Leyba a revised Masterworks" list.  (See, D. Exhibit 56; see also, Exhibit 6, p. 96-97).

87. On September 24, 2012, Rojas sent to Leyba a "corrected proposal" for sculptures.  (See, D. Exhibit 57; see also, Exhibit 6, p. 98).

88. On September 27, 2012, Rojas sent to Leyba a revised Masterworks list, including the artwork *Triton*. (See, D. Exhibit 58; see also, D. Exhibit 6, p. 99-100).

89.   On November 7, 2012, Leyba sent a revised list of artwork to Rojas, stating that he was expecting to close at that time three (3) or four (4) pieces and that, at the beginning of year 2013, he hoped to close 2-3 additional artworks with other clients.  (See, D. Exhibit 59; see also, D. Exhibit 6, p. 101-103).

90.   On November 29, 2012, Leyba sent a new revised list of "pre-selected" Masterworks with prices.  (See, D. Exhibit 60; see also, Exhibit 6, p. 103).

91.   On February 1, 2013, Leyba sent to Rojas a revised list of the Masterworks and also, two (2) pictures of "Photographismes" with their prices. (See, D. Exhibit 61A-B; see also, Exhibit 6, p. 104-108).

92.   On February 2, 2013, Leyba sent to Rojas a list of small and middle size artwork, deleting sold artwork and adding new artwork.  (See, D. Exhibit 62; see, also, Exhibit 6, p. 111-112).

93.   On February 25, 2013, Rojas sent to Leyba a "revised proposal" of middle sized works.  (See, D. Exhibit 63; see also, Exhibit 6, p. 112-113).

94.   Vasarely was not copied on any of the emails between Rojas and Leyba exchanging proposals, lists, and prices.  (See, D. Exhibit 6, p. 114).

95.   On May 17, 2013, Rojas sent an email to Leyba requesting the closing of the following artwork: *Triton, Keple-Gestalt* and *Graphisme-III*. (See, D. Exhibit 64; see, also, Exhibit 5, p. 7).

96.   Leyba responded on May 21, 2013 that *Triton* was a sure thing.  (See, Exhibit 64; see, also, Exhibit 5, p. 7).

97.   The payment for *Triton* was concluded in October 2013.  (See, D. Exhibit 2, p. 37).  Then, in November 4, 2013, Leyba wrote to Rojas and Vasarely and asked that the terms to close on the artwork *Keple-Gestalt* and *Graphisme* be honored.[4]  (See, D. Exhibit 28; see, also, D. Exhibit 5, p. 8-9).

98.   In his Unsworn Statement, Leyba confirmed that the only pending artwork to be closed were *Keple-Gestalt* and *Graphisme*. (See, D. Exhibit 65).

99.   The Agreement between the parties does not contain a "lay away" clause. (See, D. Exhibit 3).

100.  Rojas admitted there are no invoices for the allegedly reserved or earmarked artworks.  (See, D. Exhibit 5, p. 16).

101.  Rojas admitted also there has been no cash exchange or payment for any of the allegedly reserved or earmarked artwork. (See, D. Exhibit 1, p. 312-316. 114).

102.  On November 24, 2013, Leyba wrote an email to Rojas and Vasarely, informing them that, after reading the complaint [in the case of caption], he had prepared an unsworn statement "in an effort to clarify some sections of the complaint that do not completely reflect the facts involving me and my clients".  He included the statement as an attachment to the email.  (See, D. Exhibit 65; see also, D. Exhibit 5, p. 14).

---

[4] Some potential buyers had apparently shown interest in these two (2) pieces and had asked that they be "reserved" for potential purchase, yet no payment had been (or was ever) effected in order to finalize a sale.

103.  Leyba further confirmed that Vasarely had not interfered with any sales.  Id.

104.  On March 15, 2014, Rojas sent an email to Leyba informing him about a Judgment issued by the Court in France "against Michele" for "immediate execution" and, also, about another Judgment, allegedly "unappealable" regarding moral rights.  (See, D. Exhibit 66; see also, D. Exhibit 1, p. 256-257).

105.  Rojas admitted that, aside from some isolated artwork that may be identified, if the French Judgment is executed, Vasarely would have to return some of her artwork.  Therefore, he would not be able to sell such artwork under the Agreement.  (See, D. Exhibit 1, p. 263-264).

106.  Leyba (nor any of his corporations nor any of his clients) has not purchased or sold any more artwork from Vasarely, not even *Keple-Gestalt* or *Graphisme III*.  (See, D. Exhibit 15, ¶21;  D. Exhibit 65).

107.  During 2013 and early 2014, the communications between Vasarely and Leyba were essentially limited to the issue of the certificates of authenticity.  (See, D. Exhibit 65).

108.  After that, Vasarely and Leyba have not kept much contact. However, they sporadically talk over the phone on a social basis. General information about the status of Vasarely's judicial cases, in Puerto Rico and abroad, has been occasionally exchanged.  Leyba has not mentioned the two (2) artworks "reserved" for sale.  (See, Exhibit 15, ¶23).

### Count VI- Breach of Employment Agreement

109.    Upon Vasarely's arrival into the United States, she was able to live in American territory with an employer visa sponsored by Rojas' corporations. (See, D. Exhibit 1, p. 78).

110.    Rojas does not keep a copy of the "job offers" that his corporations extended to Vasarely in the past and he cannot remember what they entailed. (See, D. Exhibit 1, p. 137-139).

111.    All of the "job offers" included payment of a salary. But, Rojas (nor his corporations) never paid Vasarely a salary, as an "employee" under their sponsorship. (See, D. Exhibit 15, ¶27).

112.    For year 2012-2013, Inart Services, Inc. sponsored a visa for Vasarely, employing her as curator, under the same position and terms of employment as she previously had. (See, D. Exhibit 1, p. 127-130).

113.    Rojas does not remember what those terms of employment were. (See, D. Exhibit 1, p. 127-130).

114.    For the term of the 2012-13 visa, Rojas did not pay Vasarely a salary because she never started working and, thus, the employment agreement never took place. (See, D. Exhibit 1, p. 132-133).

115.    The visa-related expenses paid by Rojas include $1,550.00 for the Department of Homeland Security and attorney's fees in the amount of $1,500.00. (See, D. Exhibit 69; see, also, D. Exhibit 1, p. 160).

116.   The only activities that Rojas planned for Vasarely were a "welcome party" (for which Vasarely had to pay the invoice related to the public relations specialist chosen by Inart to organize it) and a commitment to organize a retrospective within the context of one year, at the Museo de Arte Contemporáneo ("MAC").  Rojas was unable to produce any document reflecting any commitment to hold such show.  (See, D. Exhibit 1, p. 133-134; and D. Exhibit 17, p. 550).

117.   On August 19, 2013, Inart Services wrote to Vasarely to notify that "Inart Services, Inc., has determined to accept your multiple verbal and written resignations from your employment" with Inart Services and that, regardless of her voluntary resignation, it was nonetheless terminating her employment with Inart Services, effective immediately. (See, D. Exhibit 70; see also, D. Exhibit 1, p. 158-159).

118.   Vasarely actually never resigned from her employment with Inart Services, as such, the "employment" never really took place for any of the years that Plaintiffs sponsored her visa.  (See, D. Exhibit 15, ¶28).

### The Chicago Studio

119.   Around 2002-2003, Héctor Rojas, Luis Rojas' brother, purchased a property at 312 N. May St., in Chicago, IL, for the price of $305,000.00 for use by Luis Rojas and Vasarely as an art studio. (See, D. Exhibit 17, p. 733-735, 756).

120. On February 21, 2006, Héctor Rojas sold the property to plaintiff Luis Rojas. However, the change in ownership was not registered in the Chicago records because they "forgot" to do so. (See, D. Exhibit 17, p. 737-739, and 743-744; D. Exhibit 71).

121. On September 15, 2010, the Rojas brothers and Vasarely entered into an agreement regarding such property. (See, D. Exhibit 17, p. 752-753; see also, D. Settlement Agreement, Exhibit 72).

122. Pursuant to clause 1 of that Agreement, Rojas would identify a real estate agent and submit his/her qualifications to Vasarely for her approval prior to designation. Also, pursuant to that clause, the listing price would be determined by agreement between Vasarely and Luis Rojas based "on current market prices." It was further agreed that the property could not be sold below the listing price except by written agreement of both parties. (See, D. Exhibit 72; see also, D. Exhibit 17, p. 755-756).

123. Pursuant to clause 2 of the Agreement, both parties would equally pay for the costs associated with the sale, including but not limited to closing costs, re-zoning expenses, real estate taxes for year 2009 and any subsequent taxes accrued at the time of sale; appraisal, attorneys' fees and title company fees. (See, D. Exhibit 72).

124.   Pursuant to clause 3 of the Agreement, the proceeds of the sale of the property would be divided 50-50 between both parties. (See, Exhibit 72; see, also, D. Exhibit 17, p. 752-753).

125.   Additionally, as per clause 3 of the Agreement, Vasarely was also entitled to a reimbursement for real estate taxes she had paid for years 2007, 2008, plus an additional $1,000.00. (See, D. Exhibit 72; see also, D. Exhibit 17, p. 770, 780).

126.   The Studio was sold on May 21, 2013 for $300,000.00. (See, D. Exhibit 73; see also, D. Exhibit 17, p. 781-782).

127.   Rojas did not obtain an appraisal of the property before the sale. (See, D. Exhibit 17, p. 758).

128.   The sales price paid by the purchaser was as follows: $175,000.00 at the closing and $125,000.00 in monthly installments. (See, D. Exhibit 17, p. 782-783).

129.   Out of the $175,000.00 payment from the closing, after deducting some fees, Rojas received three (3) payments: a) $25,113.14; b) $10,000.00, and c) $1,701.06. (See, D. Exhibit 74A-B; see also, D. Exhibit 17, p. 785-787).

130.   As to the monthly installments, Rojas received payment in full, as follows:

   a.      July 26, 2013- $10,500.95

   b.      September 16, 2013- $21,201.90

   c.      October 11, 2013- 11,600.95

   d.  November 21, 2013- $10,600.95

   e.  December 16, 2013- $13,080.93

   f.  January 14, 2014- $10,600.95

   g.  February 6, 2014- $5,800.95

   h.  March 10, 2014- $1,100.00

   i.  March 11, 2014- $5,300.95

   j.  March 31, 2014- $5,300.95

   k.  May 5, 2014- $10,615.20

   l.  May 29, 2014- $10,615.20

   m.  July 9, 2014- $15,968.50

(See, D. Exhibit 74A; see also, D. Exhibit 74C-D; D. Exhibit 17, p. 787-797).

131. Upon completion of payment of the installment amounts, Rojas issued a Warranty Deed to the new purchaser, reflecting conveyance of the property for the amount of $10.00. (See, D.  Exhibit 75; see also, D. Exhibit 17, p. 798-799).

132. The real estate taxes paid by Vasarely for years 2006-2008 were the following: $18,403.67 and $8,381.72. (See, D. Exhibit 76).

133. At the time of the sale, the due taxes amounted to $101,917.41, out of which the principal amounted to $63,782.54 and the remaining $38,124.87 were related to moneys owed for "taxes sold" and penalties. (See, D. Exhibit 77).

134. The correspondence regarding the Studio was sent to the address of Héctor and/or Luis Rojas in Puerto Rico. (See, D. Exhibit 17, p. 764).

135. Rojas does not have any written communications with Vasarely regarding the payment of taxes for the property. (See, D. Exhibit 17, p. 761-762).

136. Rojas has not paid to Vasarely any of her proceeds regarding the sale of this property. (See, D. Exhibit 17, p. 895).

### The Chicago Condo

137. Unit 1904 of the building located at 910 S. Michigan Ave. was purchased by Rojas, under his name, for a price of $1.160 million in 2003-2004. (See, D. Exhibit 78A-B).

138. As part of the investment, the property was remodeled for an additional estimated amount of $250,000. (See, D. Exhibit 17, p. 818-820).

139. On May 17, 2007, Rojas wrote a letter stating that Vasarely was 100% owner of units 1904 and 1906 located at S. Michigan Ave., Chicago. (See, D. Exhibit 79; see also, D. Exhibit 17, p. 803-804).

140. Vasarely has no credit in the United States. (See, D. Exhibit 17, p. 748).

141. In September 3, 2010, Rojas signed a "Memorandum of Note" as it related to a Promissory Note he had previously executed on that same day.  It stated that 100% of the "net proceeds" from the sale of the property would be paid to Vasarely.  Net proceeds is defined in the promissory note as the "usually and customary closing costs and expenses, broker commissions, loan

pay-offs, and usual and customary prorations for real estate taxes and assessments." (See, D. Exhibit 80A-B; see also, D. Exhibit 17, p. 804-806).

142.  On April 15, 2013, Rojas sold the property for $1.075 million. (See, D. Exhibit 81).

143.  The property was sold without an appraisal.  Rather, an appraisal for another property of the buyers was made. (See, D. Exhibit 82, see also, D. Exhibit 17, p. 813-814, and 837-839).

144.  The settlement statement reflects in line 1307 that $46,716.28 were retained as an Estimate of Redemption of taxes to Chicago Title. Rojas admitted that he received back $1,000.00.  (See, D. Exhibit 83A-B; see also, D. Exhibit 17, p. 857-859, and 861-862).

145.  Canning & Canning LLC is a law firm used by Rojas for his legal matters. Chris Canning does the litigation and Barbara Canning is the real estate lawyer to whom Rojas gave a power of attorney to take care of the sales of the properties in Chicago. (See, D. Exhibit 17, p. 756-758, 768, and 866-868).

146.  The realtor who sold the property at Unit 1904, Jim Keeney, is a friend of Barbara Canning.  (See, D. Exhibit 17, p. 809, 812-813).

147.  During the showing of the property, the water pipes that provide heating to the floors were left open by the realtor, causing a major leak to the unit below. (See, D. Exhibit 17, p. 841-845, and 855-857).

148.   As a result of the damages suffered by that property, Rojas paid to the downstairs' neighbor (by the last name of Eves) a total of $27,000.00, which was deducted from the proceeds of the sale.  (See, D. Exhibit 84, line 1308.003; see also, D. Exhibit 17, p. 841).

149.   An agreement was also signed by Rojas whereby an escrow account was opened and the amount of $18,000.00 was deposited in it, to cover additional future damages to the Eves' not covered by their insurance claim.  (See, D. Exhibit 85; see also, D. Exhibit 17, p. 829-830).

150.   The Eves' insurance claim is closed, as they already received the insurance payment. (See, D. Exhibit 86).

151.   The escrow agreement names Canning & Canning as the escrow agent. (See, D. Exhibit 85; see also, D. Exhibit 17, p. 832).

152.   Rojas is not aware of any invoices or amounts claimed against such escrow account. (See, D. Exhibit 17, p. 835-836).

153.   Line 1306 of the Settlement Statement reflects that $18,000.00 on escrow were actually disbursed to cover "past due attorneys' fees" to Canning & Canning, LLC. (See, Exhibit 84). The Disbursement Authorization document confirms an amount of $18,000.00 for the same concept. (See, D. Exhibit 87A-B; D. Exhibit 17, p. 828-829, 869-870).

154.   On April 7, 2013, Vasarely wrote to Rojas and asked for an accounting regarding the sale of the property. She specifically demanded "the difference"

and she objected to the payment of his attorneys (Canning & Canning LLC) from the sales price, since she did not chose them. (See, D. Exhibit 45).

155.   On April 8, 2013, a Release of Memorandum Note was registered in which Vasarely supposedly released Rojas of all claims on the Note for $1.00. The Release of Memorandum Note only contains Vasarely's signature on page 2 of the document, with a description of the unit.  (See, D. Exhibit 88; see also, D. Exhibit 17, p. 875-880).

156.   Barbara Canning, acting as Notary Public, certified that Vasarely signed the document before her, yet Vasarely has never returned to Chicago since her departure from that city on October 27, 2012.  (See, D. Exhibit 15, ¶32).

157.   Vasarely has never seen the first nor the last third page of said "Release of Memorandum Note."  (See, D. Exhibit 15, ¶31).

## LEGAL ANALYSIS

### 1.   Breach of Contract of the September 2010 Agreement.

Defendant Vasarely originally raised in her Counterclaim that Plaintiffs breached the September 2010 Agreement.  Now, Vasarely argues in her Motion for Partial Summary Judgment that, pursuant to the Puerto Rico Civil Code, she is entitled to recision of the September 2012 Agreement for Plaintiffs' breach.  See, P.R. Laws Ann., tit. 31, sec. 3052. ("The person prejudiced may choose between exacting the fulfilment of the obligation or its rescission, with indemnity for damages and payment of interest in either case. He may also demand the rescission, even after having requested its fulfilment, should the latter

appear impossible."). Since Plaintiffs have materially breached the contract, Vasarely states that she can terminate the contract and has no further obligation to its terms. See Hernández v. Padilla, 142 D.P.R. 989 (1997) (The right to rescind obligations is implicit in cases where obligors do not fulfill what has previously been agreed to; when one of the parties does not fulfill its main obligation, a valid and effective contract may be resolved).

Under Article 1054 of the Puerto Rico Civil Code, the elements of a cause of action for breach of contract are (1) a valid contract and (2) a breach by one of the parties to the contract. Torres v. Bella Vista Hosp., Inc., 523 F.Supp.2d 123, 152 (D.P.R. 2007). No allegations that the contract is invalid have been raised by the parties here.

The Agreement, which was signed in September 2010, sets out the terms and conditions under which Plaintiffs and Defendant would carry out the sale of certain artworks painted by Vasarely's late father in law and husband. The Agreement states that, after the first one year term had passed, the parties could terminate the agreement without any reason, with notification in writing of at least sixty (60) days in advance. The agreement could also be terminated for reasonable cause or for breach of contract with eight (8) days notice.

Regarding Plaintiffs' actions, the uncontested facts show that: 1) Plaintiffs kept more than the number of works the Agreement contemplated; 2) copies of the invoices for most of the sales were not sent to Defendant; 3) with one exception, monies for the artwork were paid to Plaintiffs, who would then pay Defendant (as opposed to being paid directly to her by the client); 4) that an installment agreement for some of her work was agreed to by Inart

Services, which was not authorized to do so; and 5) that Defendant was not given all the proceeds of the installment contract sale with Campolieto, including monies, an artwork by Melvin Martínez and a Mercedes Benz vehicle. All these facts are plainly buttressed by the uncontested evidence in the record.

Plaintiff Rojas counters by stating, without any citation to any evidence except his self-serving word, by stating that the Agreement "was modified" orally, because it became impossible to abide by its terms. This is insufficient at summary judgment. If the Agreement was modified, the Court would have expected sophisticated business people, like the ones in the present case, to put it in writing. As the record stands before the Court, any modifications to the Agreement had to be done in writing, and Defendant has clearly shown they were not.

Regarding the first issue, it is uncontested that Plaintiffs kept more than the works allowed by the Agreement. Regarding the invoices and direct payments to Defendant, Plaintiffs counter with the fact that, at least "on one occasion", these were sent to Defendant, yet offers no further evidence to bolster his opposition. This is also insufficient to challenge summary judgment.

The same applies to the meager evidence proffered by Plaintiffs to challenge the delay in changing the registration of the Mercedes Benz: that Vasarely had put it off, and when Rojas went to the CESCO to do so, he did not have the necessary documentation. But apparently, he did have the necessary documents to register the car in his name instead.

Finally, the same also applies to the painting by Melvin Martínez, which was not returned to Vasarely until after the attachment hearing. All of these acts constitute clear breaches of the Agreement.

Regarding the termination, Defendant avers that, when she emailed Plaintiffs on April 7, 2013 (where she indicated that she "no longer wanted to work" with Plaintiff Rojas), since she was not actually "working", that this was in fact notice to Plaintiffs that Vasarely was terminating the Agreement. Plaintiffs contend this was not a termination of the Agreement for the sale of art, but rather, termination of her employment contract, and furthermore, that it was one in a long history of emails of this type routinely sent by Defendant. This, notwithstanding the fact that it is undisputed that in January 2013, Vasarely had previously informed Plaintiffs that they had "not respected" any of the agreements they had made, and she had demanded all her artwork in Plaintiffs' possession, as well as keys to her car, warehouse and apartment, all pursuant to the Agreement.

This argument is unavailing to Plaintiffs, they have specifically admitted that Vasarely was never paid and that the employment agreement for 2012-2013 never began. See, section 6, below. Therefore, when Inart Services wrote to Vasarely on August 19, 2013, to notify her that Inart Services was terminating her employment, such a dismissal was moot.

The Court finds that Plaintiffs clearly breached the Agreement, and Vasarely's email of April 7, 2013 was termination notice to Plaintiffs of the contractual agreement. Therefore, the clock started ticking eight (8) days later, on April 16, 2013 for Plaintiffs to

return the artwork in their possession to Vasarely.  Thus, the Court recommends that Defendant Vasarely's request for partial summary judgment for the breach of contract claim be GRANTED and she be awarded damages.

Regarding the damages, however, the Court finds there are genuine issues of fact regarding the "base price-sale price" payments with Mr. Leyba's pieces that prevent summary disposition. While Vasarely contends the Agreement does not foresee any commissions paid to third parties (and in any event, she argues, any such commission would come out of Plaintiffs 20% share, not her 80%), Defendant has managed to raise an issue of material fact regarding these payments, and how these figures were computed by Leyba.  Whether, in fact, any monies are owed to Plaintiffs, and if they are, how much, will be up to the trier of fact to decide.

The same applies to the Campolieto installment contract. While it is undisputed that the Mercedes Benz vehicle was to be given to Defendant (and as of this writing, it has not), issues of fact remain regarding how much is owed to her pursuant to this sale, and whether it was Plaintiff Rojas' responsibility to give Defendant a missing ring which Plaintiffs allege should be deducted from her share of these monies.

Finally, Defendant has not rebutted Plaintiffs' allegations regarding Defendant's alleged unilateral increase in price for the *Zebres* piece, after an agreed upon price had already been reached with a buyer.  See Docket No. 1, ¶ 31.  This also remains an issue of material fact the trier of fact must evaluate and decide at trial.

This brings the Court full circle, to where it began its analysis of this claim. Defendant has requested that the contract be rescinded, since Plaintiffs have materially breached its terms. Yet, the termination clause in the Agreement specifically allows for a party to terminate in case of a breach, which the Court has found occurred here. Having noticed Plaintiffs of her intent to terminate the Agreement after the one year period, by operation of law, the Agreement is considered terminated.

In sum, it is recommended that partial summary judgment regarding Vasarely's breach of contract claim be **GRANTED** in Vasarely's favor, and that, as a result of Plaintiffs' breach, Defendant Vasarely be entitled to damages to be determined at trial. Issues of material facts also remain as to the *Zebres* piece and the ring that are to be addressed at trial.

## 2. Tortious Interference with the Installment Sales Contract (Campolieto).

To establish a tortious interference claim, a plaintiff needs to show: (1) the existence of a contract, (2) that the defendant interfered with the contract, (3) that the defendant was at "fault," (4) that the plaintiff suffered damages, and (5) that a causal link exists between the plaintiff's damages and the defendant's fault. New Comm Wireless Servs. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (*citing* Gen. Office Prods. Corp. v. A.M. Capen's Sons, Inc., 15 P.R. Offic. Trans. 727, 734–35, 115 D.P.R. 553 (1984)).

On August 26, 2012, Inart Services entered into and agreement with Campolieto, Rojas' neighbor, for the purchase of the piece titled *Gestalt-Rugo*. The agreement stated

that, the total price for the piece would be $380,000.00. Payment would be effected as follows: a down payment of $60,000.00 in cash or check; the transfer of a Mercedes Benz vehicle valued at $60,000.00, and the transfer of an artwork by Melvin Martínez valued at $20,000.00, for a total of $140,000.00. The remaining balance of $250,000.00 would be paid in twenty five (25) monthly installments of $10,000.00.

Plaintiffs aver that Defendant interfered with Plaintiffs' rights in their agreement with Campolieto by requiring that the totality of the remaining installments from the purchaser be paid directly to her, and by falsely advising Campolieto that she should be paid directly without the permission of Inart Services or Rojas, an action "that Plaintiffs have not authorized."

Defendant posits in her partial summary judgment request that it was Inart Corp. (not Inart Services) who was authorized by her to sell her artwork, and that in any event, she did not authorize the installment agreement in writing. Regarding the monies, she argues that Inart Services caused the client to pay the full sales price to said corporation, thus indirectly voiding its Inart's obligation to ensure that clients paid directly to Vasarely; that Rojas has refused to transfer the car to Vasarely's name and placed an illegal attachment over it.

Exhibit 36, however, belies the allegation that Defendant did not consent to the sale to Campolieto. While there are other emails that state that she did not see the contract and asked Plaintiffs repeatedly to send it to her, at some point she consented to this particular transaction, therefore, her argument misses the mark. The same goes for the issue that

Inart Services was not authorized to sell her artwork; it is waived,  since she consented to the deal in writing, as demonstrated by Exhibit 35.

Regarding Defendant's allegation that Inart had an obligation to ensure that clients paid directly to Vasarely, while none can be found in the Campolieto contract, it certainly was an obligation in the Agreement between Plaintiffs and Defendant, which applies to the sale of all pieces of art.  In fact, while Vasarely herself was not a signatory to the contract between Inart and Campolieto, two (2) things are evident: 1) the Inart/Campolieto contract was subject to the Agreement between Inart and Vasarely [5], and that Agreement *did* provide for direct payment to Vasarely; and 2) the contract between Inart and Campolieto states that Inart was acting as Vasarely's representative.  Therefore, it is illogical to argue that Defendant was in fact, interfering with a contract between Campolieto and, basically, herself.  Therefore, Inart's argument that it had to "authorize" that the monies be paid to Defendant is inapposite.

The Court has already ruled that Plaintiff Rojas breached several items of the Installment Sales Contract with Defendant, including keeping the Martínez piece (until ordered by the Court to return it) and registering the Mercedes Benz automobile in his name instead of hers.  However, there are issues of fact as to the amounts paid and owed. Rojas admitted he "did not know how much was paid to her", yet Vasarely admits in the

---

[5] More to the point, the piece sold, *Gestalt Rugo*, was listed in Appendix A to the Agreement between Plaintiffs and Defendant.  See Exhibit 3, Appendix A.

answers to Interrogatories posed by Plaintiffs that she had been paid $76,500.00 as of July 2014.  This is still far short from the 80% that she was entitled to pursuant to the Agreement.

In view of the foregoing, it is recommended that partial summary judgment as to Plaintiffs' claim of tortious interference with the Installment Sales Contract be **GRANTED** in Vasarely's favor.  Since there are clearly issues of fact regarding the payments made and credited, it is an issue for the trier of fact to assess these amounts during the trial.

### 3.    Tortious Interference with Artwork Sale (Leyba).

Plaintiffs claim Defendant has interfered tortiously with the sale of artwork to Herman Leyba. Plaintiffs posit that Defendant interfered with Leyba's sales, which, in turn, prevented Plaintiffs from charging commission on those sales.  Defendant requests partial summary judgment on this claim and counters the same by presenting an unsworn statement under penalty of perjury from Leyba, who brokered the sales that Plaintiffs are complaining Defendant interfered with.  Plaintiffs oppose summary judgment stating there was a pending sale, and pursuant to the terms of the Agreement, Defendant could not remove the two (2) particular pieces at issue from the inventory.  Finally, Plaintiffs object to the document, indicating that it has "been provided by Defendant without explaining why Mr. Leyba is providing it", and further, that "it was taken without the participation of opposing counsel and makes unwarranted statements about the complaint of this case." (Docket No. 333-1, ¶ 110).

A cursory reading of the document, however, clearly explains why Leyba did what he did.  Apparently upon hearing of the issues between the parties,  Leyba wrote an email to both parties dated November 24, 2013, and informed them as follows: "I have read the complain(sic) and consequently after meeting with my lawyer, cc (sic) in this email, I have responded with an unsworn statement in an effort to clarify some sections on the complain (sic) that do not completely reflect the facts involving me and my clients...I truly hope that this effort on my behalf serves to facilitate a positive outcome to your dispute... I will be available through my attorney if you believe any further written statements are necessary." (D. Exhibit 65).  Leyba attached to this email the statement that Plaintiffs now object to.

It is fairly obvious that Defendant didn't "provide" anything, as Plaintiffs suggest; rather, it was Leyba who submitted the statement in an effort to clear his name and some of the allegations that Plaintiffs had raised involving him in the complaint.  It is also patently clear that, not only did Leyba sent the email with the statement to Plaintiff Rojas, but also that Leyba further offered to draft any other statements either of the parties believed necessary.  Plaintiffs cannot cry foul now when 1) they knew of the existence of the statement over a year ago; 2) they were emailed the statement directly by the declarant, and 3) when they were given an opportunity by the declarant to obtain further statements from him, and they failed to do so.  This argument is therefore unavailing to Plaintiffs.

Leyba's statement shows that, out of the three (3) pieces for sale, *Triton*, *Graphisme* and *Keple-Gestalt*, only *Triton* was sold.  Furthermore, the person with whom the contract

Luis Rojas-Buscaglia, et al v. Michele Taburno-Vasarhelyi
Civil No. 13-1766 (FAB)
Report and Recommendation
Page 41

_____

was allegedly interfered with, Leyba, has explicitly denied any such interference by Defendant and has in fact, stated quite the opposite: "Michelle has never called or emailed me directly to interfere with the sale of any artwork." D. Exhibit 65, ¶ 16.  Leyba further stated that there was never a firm order to purchase the remaining two (2) pieces, *Graphisme* and *Keple-Gestalt*, that the interested parties only made an offer to reserve the pieces for potential purchase, and that this pre-selection process did not represent a final sale or commitment to purchase the pieces. Id. at ¶¶13, 14, and 17.  Finally, Leyba indicated that his clients had not entered into any other deals to buy art from Defendant. Id. at ¶16.

Therefore, it is clear that Plaintiffs' claims do not meet the first element, namely, a pre-existing contractual relationship with which Defendant interfered.   Leyba has specifically denied any such sale contract exists.  Only an offer to reserve items existed at the time, which is not a final sale, because only when funds are received in full can a sale of art be considered closed and final. Id. at ¶¶ 14 and 15.  Additionally, Leyba also explicitly denied any interference by Defendant in the possible future sale of these two pieces.

Thus, it is recommended that partial summary judgment be **GRANTED** in Vasarely's favor, as to Plaintiffs' claim of tortious interference, and this claim be **DISMISSED.**

### 4.    Certificates of Authenticity.

In response to this claim, Plaintiffs have admitted that Vasarely has in fact, produced these certificates. Plaintiffs nevertheless claim damages for Vasarely's wrongful delay in producing them.

In Defendant's motion, she posits that she had good cause to withhold the certificates, insofar as she did not have all the relevant information to do so due to Plaintiffs' inaction. It was not until after Leyba sent to Defendant the necessary information that the certificates were produced in March 2014. The fact that Defendant was missing important information that prevented her from completing the certificates was buttressed by Leyba in his statement. See, D. Exhibit 65, ¶8. Plaintiffs counter saying that Defendant never requested this information.

Defendant further avers that, in any event, she had no responsibility to issue the certificates, as she had not been fully paid, as required under the Agreement. This fact is also buttressed by the record. In fact, the record is clear that as of October 8, 2013, Defendant had apprised Plaintiffs that she would not issue the certificates of authenticity until she was paid what she was owed.

As such, there are issues of material fact as to the reasons for the delay in the issuance of the certificates of authenticity by Defendant and whether Defendant had been paid in full to trigger the obligation of issuance of the certificates under the Agreement which precludes summary judgement.

Wether Defendant had been paid in full, in turn, raises the base price/sale price issue, which as the Court has already stated presents an issue of fact that prevents summary judgment from being entered in this claim. Until that issue is cleared up, there is no way of knowing whether or not such alleged good cause existed to withhold the certificates, and how much, if anything, is in fact owed to Defendant.

Therefore, it is recommended that partial summary judgment as to the delivery of the certificates of authenticity be **DENIED**, inasmuch as issues of fact remain as to reasons for the delay in delivery of the certificates, whether Vasarely had been fully paid, which in turn go to the damages issue which should be assessed by the trier of fact.

### 5.   Personal Defamation and Damages.

Defendant has claimed that Plaintiffs cannot meet their burden on this claim, insofar as Leyba is the only person with knowledge regarding this count of the Complaint.  As evidence, Defendant brings forth Plaintiffs' answers to an interrogatory, where it explicitly states that Leyba has knowledge as to Count 5.  Plaintiffs, however, aver that allegations of damages to commercial reputation were also raised in Count 2 as to the deal with  Mr. Campolieto.

The Court agrees that Plaintiffs have raised defamation allegations regarding the Campolieto purchase which are not addressed in Defendant's Motion for Partial Summary Judgment. The Court therefore cannot recommend summary disposition of these claims.

Regarding Leyba, as stated in a previous section, there are genuine issues of fact as to whether or not the withholding of the certificates was made in good faith (i.e. Defendant did not request the information to prepare them) or whether her actions were justified for lack of payment. In light of that missing important information, which if the Court finds were attributable to Plaintiffs' inaction, would substantially alter this claim, the Court cannot rule on the same at this time.

As such, it is recommended that partial summary disposition on the claim of personal defamation be **DENIED**.

### 6.    Damages for Vasarely's Breach of her Employment Contract.

Plaintiffs also claim they suffered damages as a result of Vasarely's breach of the employment contract with Inart.  It is uncontested that, upon Vasarely's arrival into the United States in 2012-2013, Inart paid for her visa.  Notwithstanding that, this was a "curator" position offered barely three (3) years ago, Plaintiff Rojas did not keep a copy of the "job offers" that his corporations extended to Vasarely in the past and cannot remember what they entailed.

Vasarely counters with the argument that she never "began" to work and she was never paid an employee salary while under Inart sponsorship.  As evidence of this fact, Vasarely claims that the only activities that Rojas planned for her were a "welcome party" (where Vasarely paid the invoice related to the public relations specialist chosen by Inart to organize it) and a commitment to organize a retrospective within one (1) year at the MAC, yet Plaintiffs were unable to produce any documentation from anyone reflecting any commitment, firm or tentative, to hold these activities.  Thus, Defendant posits she could not have resigned her employment with Inart Services, as she never actually worked for any of the years that Plaintiffs sponsored her visa.

Plaintiffs, however, have specifically admitted they did not pay Defendant a salary for 2012-2013 because she never began to work.  Therefore, the Court agrees that Defendant never actually resigned because she never actually began to work.  There can be

no breach of an employment agreement that Plaintiffs specifically admitted never began.

Therefore, it is recommended that partial summary disposition of this claim be **GRANTED** in Vasarely's favor and Plaintiffs' claim for damages of her alleged breach of employment contract be **DISMISSED**.

### 7.    **Chicago Studio and Condo.**

As part of Defendant's answer to the Complaint, she filed a counterclaim with multiple counts. Among them were two (2) counts for breach of contract for two (2) different properties in Chicago, to wit, one studio (the "Studio") and one Condo (the "Condo").

Regarding the Studio, the parties signed an agreement to sell the property, where both had to agree on the listing price. Regarding the proceeds of the sale of the Studio, they agreed they would be distributed equally between Vasarely and Rojas and that Vasarely would be reimbursed back taxes she paid for the years 2007 and 2008.

It is uncontested that the Studio was sold in 2013 for $300,000.00. Furthermore, Plaintiff Rojas has admitted he has not paid to Defendant any of the proceeds of the sale and he has not refunded Vasarely the 2007 and 2008 tax years. Partial summary judgment is therefore recommended to be **GRANTED** as to the breach of contract claim of the Studio. The amounts in question due to her, however, are disputed and should be assessed by the trier of facts.

Defendant submitted a document evidencing back taxes that the property owed from 2009-2011 amounting to $101,000.00, of which $38,134.87 were penalties for late

Luis Rojas-Buscaglia, et al v. Michele Taburno-Vasarhelyi
Civil No. 13-1766 (FAB)
Report and Recommendation
Page 46

payments.  These facts stand admitted by Plaintiffs.  As previously stated, pursuant to the agreement, Plaintiffs and Defendant were jointly responsible for payment of these taxes, yet, since Plaintiffs failed to pay them and/or notify Defendant as to them, she argues she should be reimbursed for the penalties in late payment.

Plaintiffs counter that it cannot be proven that the lack of payment was intentional, as Plaintiff Rojas never received notice; this, even when the correspondence regarding the property was sent to the attention of Plaintiff Rojas and his brother in Puerto Rico.[6]  Intent, however, is irrelevant to the terms of the agreement, which makes no such requirement. Thus, the Court agrees with Defendant, and finds that Plaintiff should be held liable for the penalties, as the agreement does not contemplate bad faith.

Regarding the specific amounts to be repaid to Defendant, she has submitted evidence that she paid $18,403.67 for 2007-2008 in back taxes.[7]   There is no further evidence before the Court.  Therefore, the Court recommends that it be determined that Vasarely is owed $84,551.29 for half of the proceeds of the sale of the studio, $38,134.87 for the back tax penalties and at least $18,403.76 for 2007-2008 payments. If there is further evidence of other payments made for the applicable time period presented at trial, they can be added to this total.

---

[6] The Court takes judicial notice that a document that is deposited in the mail and sent to the correct address is presumed to be received. Plaintiffs have not alleged the address on the official Cook County, IL correspondence is somehow incorrect.

[7] Defendant mistakenly included some payments for 2006, which are inapplicable pursuant to the agreement, and no evidence was submitted for the alleged 2008 payment for  $8,381.72. Therefore the Court did not consider this last amount in its computation.

Turning now to the Condo, in March, 2004, Rojas purchased the Condo, located at 910 S. Michigan Ave., Unit 1904, in Chicago for $1.160 million and registered it under his name because Vasarely had no credit.  The property was renovated for approximately $250,000.00.  In 2007, Rojas singed a document that stated the Condo and its contents belonged to Vasarely and that is had been acquired using her funds.

On September 2010, Rojas signed a "Promissory Note", in which the "Maker", Rojas, promised to pay the "Holder" (presumably, Vasarely, pursuant to the 2007 document) the total net proceeds from the sale of the unit.  Stemming from that document is the fact that Rojas was only authorized to deduct "customary closing costs and expenses; broker's commissions; loan pay-offs; and usual and customary prorations for real estate taxes and assessments".  D. Exhibit 80-B.

Nine (9) years later, on April 15, 2013, Rojas sold the Condo for $1.075 million.  An appraisal of the property was not obtained and there is no written evidence that Vasarely consented to this sale.  At some point during the listing of the apartment, a faucet was left open by the real estate agent chosen by Rojas, which caused water damage to the floor below.  The damages cost $27,000.00, which Rojas deducted from Vasarely's proceeds of the sale.[8] An agreement was signed by Rojas whereby an escrow account was opened with the amount of $18,000.00 placed in it to cover any future damages not covered by the insurance.  The escrow agreement names Canning & Canning, Rojas' attorneys for this sale, as the escrow agents. Yet, the Settlement Statement for the sale reflects, in line 1306, that

---

[8] This notwithstanding the fact that there seems to haven been an insurance policy  in place, which did, in fact, pay for this loss.  See D. Exhibit 86, item 1 ("Documents not retained after receipt of insurance money").

Luis Rojas-Buscaglia, et al v. Michele Taburno-Vasarhelyi
Civil No. 13-1766 (FAB)
Report and Recommendation
Page 48

_____

$18,000.00 on escrow were actually disbursed to cover "past due attorneys' fees" to Canning & Canning, LLC. D. Exhibit 84. The Disbursement Authorization likewise confirms an amount of $18,000.00 for "past due attorneys' fees" in Line "E". D. Exhibit 87(A).

On April 7, 2013, Vasarely wrote to Rojas and asked for an accounting regarding the sale of the property. She specifically demanded "the difference" and she objected to the payment of his attorneys (Canning & Canning LLC) from the sales price, since she did not chose them.

Rojas submits no evidence, and simply argues that this sum was, in fact, for the escrow to pay for any further water damages. The Court disagrees. Two (2) official documents plainly state that it was for past attorneys' fees, which Rojas was not allowed to deduct from Vasarely's monies. Neither was he allowed to pay for the water damage from her monies, which in any event, was in 2013. Even assuming the claim was not closed after it was paid by the insurance company in 2013, there should be no further issues regarding any water damage at this late date. The Court agrees with Defendant that, if Rojas agreed to such payments when not authorized, they should have been paid by Rojas, not Vasarely. The Court therefore recommends that partial summary judgment on this issue be **GRANTED**, with $45,000.00[9] in Vasarely's favor.

_____

[9] Of the $45,000.00, $18,000.00 are for the monies placed in escrow and $27,000.00 for the amount Rojas actually paid the neighbors for the water damage.

Regarding the actual sale, Plaintiffs have challenged Defendants accusations that he sold below price, because of the "volatility of the market." The Court notes no such volatility seems to have been present for the sale of the Studio a month later, and it has already established that Plaintiffs improperly deducted monies from Defendant's proceeds from this sale. The fact that there was no written consent by Vasarely for the sale, no appraisal done for the property, [10] and that the real estate agent was a friend of the lawyers handling this same closing, the Cannings [11], (who in turn, were the escrow agents for the additional water damage funds to the apartment) weighs heavily against Plaintiffs' arguments, yet these are credibility issues that the trier of fact must assess. Whether the market was in fact volatile at the time of the sale also remains an issue of fact for the trier of fact to assess.

Finally, on April 8, 2013, a Release of Memorandum Note was registered in which Vasarely supposedly released Rojas of all claims on the Note for $1.00. The Release of Memorandum Note only contains Vasarely's signature in page 2 of the document, with a description of the property, with Barbara Canning acting as Notary Public for the document. Vasarely has challenged this document, stating under penalty of perjury that she has never returned to Chicago since her departure from that city on October 27, 2012. Therefore, she argues, there is no way that Attorney Canning could have notarized the document before her. Vasarely further states she has never seen the first nor the last third

---

[10] Plaintiffs have denied this fact, yet has not provided any evidence for the denial. Furthermore, the appraisal on the record does in fact, list an appraisal for a different property in the name of the buyers.

[11] Rojas had given Barbara Canning a power of attorney to take care of this same sale.

Luis Rojas-Buscaglia, et al v. Michele Taburno-Vasarhelyi
Civil No. 13-1766 (FAB)
Report and Recommendation
Page 50

_____

page of said "Release of Memorandum Note." Plaintiffs have been unable to properly contest this, and claim lack of information for their denial. This is insufficient at this stage.

Thus, it is recommended that partial summary judgment be **GRANTED** in Vasarely's favor regarding the breach of contract claims related to the Chicago's Studio and the Condo, and that the Release Memorandum Note be declared null and void. Issues of fact, however, remain as to the reimbursement amounts due to Vasarely.

## CONCLUSION

For the aforementioned reasons, it is recommended that Defendant Vasarely's Motion for Partial Summary Judgment (Docket No. 312) **be GRANTED IN PART and DENIED IN PART**, as follows:

1.    **GRANTED**, in Vasarely's favor, as to her breach of contract claim related to the September 2010 Agreement, which entitles Vasarely to damages. Issues of fact remain, however, as to the amount of Vasarely's damages, the issue of the *Zebres* piece and the ring, which are to be addressed by the Court at trial.

2.    **GRANTED**, in Vasarely's favor, as to Plaintiffs' claim of tortious interference with the Installment Sales Contract. Issues of fact remain, however, as to the amount of money due.

3.    **GRANTED**, in Vasarely's favor, as to Plaintiffs' claim of tortious interference, and this claim be **DISMISSED.**

4.    **DENIED** as to the delivery of the certificates of authenticity inasmuch as issues of fact remain as to reasons for the delay in the delivery of the

certificates, whether Defendant had been fully paid, which in turn go to damages.

5.    **DENIED** as to the defamation claims.

6.    **GRANTED**, in Vasarely's favor, as to Plaintiffs' claim for damages of her alleged breach of employment contract, and this claim be **DISMISSED**.

7.    **GRANTED**, in Vasarely's favor, as to her breach of contract claims related to the Chicago Studio and Condo.  However, issues of fact remain as to the reimbursement amounts due to Vasarely for both properties.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation.  See also, Amended Local Rules.  Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150–151(1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986) and Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988).

In San Juan, Puerto Rico, on this 10th day of March, 2015.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE