**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

LUIS ROJAS-BUSCAGLIA, *et al.*,

    **Plaintiffs,**

           **v.**                **Civil No.** 13-1766 (FAB)

MICHELE TABURNO-VASARHELYI,
a/k/a MICHELE TABURNO-VASARELY,

    **Defendant.**

**OPINION AND ORDER**

BESOSA, District Judge.

At center stage in this civil suit is Ms. Michele Taburno-Vasarely ("Vasarely"). Vasarely is the daughter-in-law of the famous "Op Art" artist Victor Vasarely. She married Victor Vasarely's son, an artist known as Yvaral, in 1969. For three decades, Vasarely worked in France as an assistant to the two artists. She also took care of Victor Vasarely during his final years before he died in 1997. Over the decades, the two artists gave Vasarely artwork as payment for her assistance and also as gifts. This way, Vasarely accumulated a large and valuable artwork collection.

In 2000, Mr. Luis Rojas-Buscaglia ("Rojas"), the widower of Vasarely's best friend, moved from Puerto Rico to Paris to work for Vasarely and her husband. Vasarely's husband died two years later.

In 2004, Vasarely and Rojas moved from Paris to Chicago together.  Their relationship quickly turned sour, and in May 2005, Rojas moved back to Puerto Rico.  Four years later, in June 2009, Rojas sued Vasarely for the division of what he alleged was community property that he shared with Vasarely worth millions of dollars.  Vasarely and Rojas settled that dispute in September 2010 by entering into an agreement pursuant to which Rojas would earn commissions selling artwork that belonged to Vasarely.

In October 2012, Vasarely moved from Chicago to Puerto Rico. Rojas helped Vasarely with this move, which involved moving Vasarely's vast collection of artwork and antiques.  Their relationship deteriorated over the next year until Rojas, along with his two companies - Inart, Corp. ("Inart") and Inart Services, Inc. ("Inart Services") - brought this lawsuit against Vasarely, raising various claims from breach of contract to defamation, primarily related to plaintiffs' sale of Vasarely's artwork. Vasarely responded by asserting several counterclaims against plaintiffs, including breach of contract concerning artwork sales and Vasarely's move to Puerto Rico.  Vasarely also sought to recover numerous pieces of artwork, furniture, and other property that she claims belong to her and are in the wrongful possession of Rojas.

After resolving four dispositive motions, see Docket Nos. 219, 407, 408, 410,[1] the Court held a bench trial on the remaining claims and counterclaims.  Over the course of nineteen days, the Court heard testimony from nine witnesses and admitted 252 exhibits into evidence.

Upon consideration of the evidence presented at trial,[2] the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.   BREACH OF THE 2010 ARTWORK AGREEMENT CLAIMS AND COUNTERCLAIMS

Plaintiffs claim that Vasarely breached the 2010 Artwork Agreement by reducing plaintiffs' commission, halting artwork sales, and delaying delivery of certificates of authenticity for sold artwork.  Vasarely counterclaims that plaintiffs breached the

---

[1] The Court entered partial judgment dismissing some of plaintiffs' claims and some of defendant Vasarely's counterclaims.  See Docket Nos. 220, 409.  The Court also entered partial judgment in favor of Vasarely on several of her counterclaims, ordering plaintiffs to pay Vasarely **$227,262.17** and to give her a diamond ring or its value of **$16,500.**  (Docket No. 409.)  Finally, the Court ordered the Clerk of the Court to disburse to Vasarely the $312,000 that plaintiffs deposited at the start of this litigation.  Id.

[2] Specifically, the Court considers the following:  the parties' stipulated facts, (Docket No. 412 at pp. 22-35); ninety-seven joint exhibits, (Joint Exs. I-XCVII); seventy-seven plaintiffs' exhibits (Pls. Exs. 1-77); seventy-eight defendant's exhibits (Def. Exs. A-SS, UU-AAAA); and testimony from nineteen days of trial, see Tr. at Docket Nos. 499, 504-518, 520-522.  The Court uses as guidance the proposed findings of fact and proposed conclusions of law that the parties submitted after the bench trial concluded.  See Docket Nos. 525-1, 525-2, 528.

2010 Artwork Agreement by refusing to give her proceeds from artwork sales, keeping an unauthorized inventory of her artwork, and refusing to return her artwork after she terminated the agreement.

The Court makes the following factual findings and legal conclusions for these claims and counterclaims.

**A.   Factual Findings**

   **1.   The 2010 Artwork Agreement**

Plaintiff Rojas is the sole owner, director, and officer of plaintiff corporations Inart and Inart Services. (Docket No. 412 at p. 22.) On September 22, 2010, Vasarely and Inart entered into an agreement ("the 2010 Artwork Agreement" or "the Agreement") pursuant to which Inart would sell certain artwork belonging to Vasarely. (Joint Ex. 1 at p. 1.) Inart would act as a "non-exclusive sales representative for Vasarely" and would sell to Inart's "own clients." Id. at pp. 1, 3.

Appendix A to the Agreement lists eleven paintings and three sculptures that Vasarely deposited on consignment with Inart. (Joint Ex. 1 at pp. 1, 7.) Clause 3 of the Agreement allows the parties to "amend Appendix A by adding and/or removing items from the list of consigned Artworks, provided that such amendments are in writing and signed by Vasarely and Luis Rojas." Id. at p. 2.

The parties never amended Appendix A in writing.  (Docket No. 412 at p. 23.)

Clause 7 of the Agreement requires Inart to "generate an invoice for each sale of Artwork" and to "deliver to Vasarely a copy of the invoice, with the name of the client and the purchase price, on the date of the sale."  (Joint Ex. 1 at p. 4.)  Clause 7 also provides that "the purchaser" must pay Vasarely 80% of the sale price and Inart 20% of the sale price.  Id.  Inart's 20% share "paid directly by the client" is Inart's "sole payment and/or commission and/or compensation," and Inart must "pay for its own expenses from [this] commission."  Id.  Clause 8 requires Vasarely to deliver the certificate of authenticity for each sold piece of artwork immediately after she receives full payment for her portion of the sale price of the work.  Id.

Clause 11 provides that either party can terminate the Agreement for reasonable cause or for breach of contract with eight days' notice.  (Joint Ex. 1 at pp. 4-5.)  Clause 12 provides that upon termination of the Agreement, Inart must return all artwork to Vasarely "by depositing them in a storage facility to be designated by Vasarely," and if the artwork has not been returned within forty-eight hours of Vasarely making available a suitable storage facility, Inart "shall be fined" $1,000 per day, payable to Vasarely.

### 2.   Auction Sales

In 2011 and 2012, plaintiffs sold at auction several pieces of artwork belonging to Vasarely.  (Docket No. 504 at pp. 7-11.)  This artwork was not listed in Appendix A of the 2010 Artwork Agreement.  Id. at p. 13.  For the artwork sold at auctions, Rojas and Vasarely agreed that plaintiffs would receive 15% commission.  (Docket No. 499 at pp. 32-35.)  They later agreed to lower the commission for auction sales to 12%.  Id.  Plaintiffs received the payments from the auction sales, kept their agreed-upon commission, and gave Vasarely her portion.  Id. at pp. 29, 41.

### 3.   Sale to Campolieto

On August 26, 2012, plaintiff Inart Services (represented by plaintiff Rojas) sold the work titled *Gestalt-Rugo*, which belonged to Vasarely, to Mr. Horacio Campolieto ("Campolieto") pursuant to an installment agreement.  (Joint Ex. III.)  The installment agreement set the sale price at $390,000, which Campolieto would pay as follows: (1) a $60,000 down payment, (2) a car valued at $60,000, (3) a piece of artwork by Melvin Martinez valued at $20,000, and (4) twenty-five monthly payments of $10,000 beginning October 1, 2012.  Id.

Vasarely was not a party to the installment agreement, and she did not agree to the terms of the agreement in writing.  (Docket No. 412 at p. 26.)  Although she requested that Rojas give

her a copy of the installment agreement several times, he refused.
Id.  Vasarely first obtained a copy of the agreement around June
2013 after asking Campolieto for it directly.  (Docket No. 512 at
pp. 58-62.)  This was the first time that Vasarely learned that the
installment agreement included an initial down payment of $60,000.
Id.  Her knowledge of the agreement before then was that it
included the car, the Melvin Martinez work, and monthly payments of
$10,000.  Id. at p. 59.

Rojas testified that from the $60,000 down payment, he
kept $12,000 and gave Vasarely her 80% share.  (Docket No. 506 at
pp. 18-19.)  Vasarely testified that Rojas gave her only $8,000
from the $60,000 down payment.  (Docket No. 512 at pp. 61-63.)  The
Court credits Vasarely's testimony in this regard.  Particularly
because Rojas repeatedly refused to give Vasarely a copy of the
installment agreement, the Court finds that Rojas concealed from
Vasarely the existence of the $60,000 down payment, having her
believe that the first payment was a regular monthly payment of
$10,000.  Thus, the Court finds that plaintiffs kept $52,000 and
gave Vasarely $8,000 from the $60,000 down payment.

The car valued at $60,000 was transferred to Rojas on
August 28, 2012.  (Docket No. 412 at p. 27.)  In September 2012,
plaintiffs collected their 20% commission for the car by deducting
$12,000 from money that they owed Vasarely from auction sales.

(Def. Ex. Q.)  Three years later, in October 2015, Rojas finally transferred title of the car to Vasarely, gave her the keys, and lifted the litigation lien that he had placed on the car.  (Docket Nos. 437 at p. 1; 440 at p. 1; 521 at pp. 3-5.)

Plaintiffs kept the Melvin Martinez work until the Court ordered plaintiffs to surrender it to Vasarely in February 2014. (Docket Nos. 118; 118-1; 412 at p. 27.)

From October 2012 to April 2013, Campolieto paid plaintiffs $70,000 in monthly payments, from which plaintiffs kept $14,000 and gave Vasarely $56,000.  (Docket No. 412 at p. 27.)  In June 2013, Campolieto paid plaintiffs $16,000 as a partial two-month payment, and plaintiffs kept the full amount.  (Docket Nos. 412 at p. 27; 506 at pp. 17-18.)  From then on, Campolieto made monthly payments to Vasarely directly.  (Docket No. 512 at pp. 67-68.)

In total, plaintiffs kept $94,000 in commission from the sale of *Gestalt-Rugo* to Campolieto.[3]

---

[3] The total of $94,000 is the sum of $52,000 (the amount plaintiffs kept from the $60,000 down payment), $12,000 (the commission plaintiffs collected over the value of the car), $14,000 (the total plaintiffs kept from the October 2012 - April 2013 monthly payments), and $16,000 (the June 2013 payment).

### 4.   Sales to Leyba

In 2012 and 2013, plaintiffs sold artwork belonging to Vasarely to an art dealer based in Miami named Mr. Herman Leyba ("Leyba").  (Docket No. 412 at pp. 24-25.)  Leyba handled all of his business with Vasarely through Rojas; he never worked with Vasarely directly.  (Docket No. 511 at pp. 54-55.)

#### a.   Sale Process

To begin the sale process, Rojas conferred with Vasarely to determine what artwork to offer for sale and at what prices.  See Pls. Exs. 24-34, 36.  Rojas then sent Leyba a list of about twenty works of art and their corresponding prices.  (Docket No. 511 at pp. 22, 26.)  Leyba discussed the list with his private clients, who would select about five works that they really liked. Id. at p. 26.  The clients usually traveled to Puerto Rico with Leyba to view these works in Rojas's apartment.  Id. at pp. 26, 32. On two of these trips, Leyba, his clients, and Rojas met socially with Vasarely after viewing the artwork.  Id. at pp. 17-18; Docket No. 517 at pp. 27-28.  The clients would make their final decisions on which pieces of artwork to purchase when they returned from these trips.  (Docket No. 511 at p. 27.)

Plaintiffs then sent invoices to Leyba's corporations for the artwork that his clients agreed to purchase. See Joint Exs. V-XVI.  Leyba invoiced his clients and, after

Civil No. 13-1766 (FAB)                                                10

receiving payment and subtracting his commission, transferred the
funds to plaintiffs.  <u>See</u> Docket No. 511 at p. 25.  Leyba testified
that sometimes Rojas invoiced the clients directly and sent Leyba
his commission after receiving payment from the clients.  <u>Id.</u>

  **b. Commission Arrangement**

   Leyba paid plaintiffs what he calls the "base price"
of each work of art.  (Docket No. 511 at pp. 22-25.)  This was the
price authorized by Vasarely and the price from which plaintiffs
deducted their 20% commission and gave Vasarely her 80%.  (Docket
No. 507 at pp. 50-51.)  Leyba charged his clients at what he calls
the "sale price," which is higher than the "base price" because it
includes Leyba's additional commission.  (Docket No. 511 at pp. 22-
25; Docket No. 507 at pp. 72-74; Joint Ex. XIX.)  In the beginning,
Leyba and plaintiffs agreed on the maximum "sale price" that Leyba
could charge for each piece.  (Docket No. 511 at p. 24.)  Later,
plaintiffs and Leyba agreed that Leyba's commission would be capped
at 15% of the "base price."  <u>Id.</u> at pp. 24-25; Docket No. 507 at
p. 19.

For example, the following table[4] summarizes the transactions for the sale of *Separam* in March 2013:

| | |
|---|---|
| Client paid Leyba ("sale price") | $188,000 |
| Leyba's commission | $28,000 |
| Leyba paid plaintiffs ("base price") | $160,000 |
| Plaintiffs' commission | $32,000 |
| Vasarely's proceeds | $128,000 |

Vasarely did not know the commission arrangement between plaintiffs and Leyba. (Docket No. 510 at p. 67.) She thought that they were splitting plaintiffs' 20% commission because that was her understanding of how co-broker deals are handled in artwork sales. Id. She explained that the art business is the same as the real estate business in this regard: when you have two brokers, they divide their profit. Id.

Plaintiffs never disclosed to Vasarely the higher "sale prices." (Docket No. 512 at pp. 12-13.) For example, after the first round of sales to a group of Venezuelan clients closed, Leyba emailed Rojas a list of the "base prices" and "sale prices" for the sales to these clients. See Pls. Ex. 18. Five days later, Rojas emailed Vasarely a list of the works and specified that they were sold to Venezuelan clients, but he included only the "base

_____

[4] See Joint Exs. IX, XIX.

Civil No. 13-1766 (FAB)                                            12

prices" and did not reveal the higher "sale prices." <u>See</u> Joint Ex. LXXXV.  Plaintiffs also never delivered copies of the Leyba invoices to Vasarely.  (Docket No. 512 at pp. 11-12.)

On May 21, 2013, Vasarely sent an email to Rojas requesting "[f]or the last time" a full accounting of the sales made through Leyba.  (Def. Ex. I.)  After receiving no response, she contacted Leyba directly.  (Docket No. 512 at pp. 12-13.) Leyba responded and disclosed to Vasarely the "base prices" and "sale prices" for the more than two million dollars worth of sales that had occurred between plaintiffs, Leyba, and Leyba's clients up to that point.  (Joint Ex. XIX.)  This was the first time that Vasarely learned that Leyba was earning a commission on top of Rojas's 20%.  (Docket No. 512 at pp. 12-13.)

Rojas testified that he discussed the commission arrangement with Vasarely and that he would "go through each sale" with Vasarely, "in person[] and by the phone" using "the documents sent from Herman Leyba."  <u>See</u> Docket No. 507 at pp. 51, 69.  The Court does not credit Rojas's testimony and finds Vasarely's testimony more credible in this regard.

### c.   Closed Sales

At the summary judgment stage, the Court determined that plaintiffs sold to Leyba's clients sixteen works of art[5] belonging to Vasarely.  (Docket No. 408 at p. 5.)  The clients paid Leyba $2,676,500 for this artwork.  Id.  After deducting his commission, Leyba paid plaintiffs $2,336,000.  Id.  After deducting their commission, plaintiffs paid Vasarely $1,540,300.  Id.

The last painting that plaintiffs sold to Leyba's clients was *Triton*.  (Docket No. 505 at p. 53.)  Rather than give Vasarely her 80% share of this sale, plaintiffs deposited $312,000 with the Clerk of the Court upon filing the complaint in this case.  Id. at pp. 53-54, 65.  At the summary judgment stage, the Court ordered these funds to be disbursed to Vasarely.  (Docket Nos. 408 at pp. 6-7; 409 at p. 1.)  The Court also ordered plaintiffs to give Vasarely a diamond ring or its value of $16,500 for plaintiffs' nonpayment for a Leyba sale.  (Docket Nos. 408 at pp. 5-6; 409 at p. 1.)

---

[5] The sixteen works are:  *Boo*, *Tekers MC*, *Kerhon*, *Egsin*, *Axon*, *Moulin*, two *Vega* color prints, *Koska Nagy* (or *Koska Neg*), *Tri-Veg*, a *Zebra* (or *Zebres*) print, *Separam*, *Emotta*, *Bela*, a *Vega* print, and *Triton*.  See Docket No. 408 at p. 5; Joint Ex. XIX.

Thus, including the partial judgment awarded in her favor, Vasarely received a total of $1,868,800 for the sales that plaintiffs made to Leyba's clients.[6]

### d.   Sales that Never Closed

During a visit to Puerto Rico with Leyba in March 2013, a particular group of his clients showed interest in various works of art.  (Docket No. 511 at pp. 32-37, 59-60, 66-71.)  For example, they liked a 1950 Victor Vasarely painting titled *Zebres*. Id. at pp. 33-35.  The clients ultimately decided not to purchase *Zebres* because its price of $640,000 (which included Leyba's commission of $40,000) was too high for them.  Id. at pp. 33-36, 70-71.  The clients instead decided to reserve for purchase three less expensive pieces, *Triton*, *Graphismes*, and *Keple Gestalt*.  Id. at pp. 32-35.  In September 2013, plaintiffs sent Leyba the invoice for *Triton*.  (Joint Ex. XV.)  That sale closed, and the clients paid for *Triton* in October 2013.  (Docket Nos. 412 at p. 30; 511 at p. 33.)

_____

[6] The total of $1,868,800 is the sum of $1,540,300 (the amount plaintiffs paid Vasarely for the Leyba sales before filing this lawsuit), $312,000 (the amount plaintiffs deposited with the Clerk of the Court for the sale of *Triton*), and $16,500 (the amount the Court ordered plaintiffs to pay Vasarely for the Leyba sales at summary judgment).   The total of $1,868,800 is also 80% of $2,336,000 (the total amount that Leyba paid plaintiffs for the sales of Vasarely's artwork, *i.e.*, the sum of the "base prices").

The sales for *Graphismes* and *Keple Gestalt*, however, were never invoiced and never closed.  (Docket Nos. 412 at p. 30; 511 at pp. 32-35.)  Leyba testified that the clients ultimately decided not to purchase *Graphismes* and *Keple Gestalt* because they lost interest after purchasing *Triton*.  (Docket No. 511 at pp. 37-38.)  Leyba decided not to "push" the sale any further because after *Triton* closed, this legal case was underway and Leyba did not want his clients to get involved in the litigation.  Id. at pp. 38-39.

Leyba's clients never purchased or reserved the twenty-eight works of art listed in Docket No. 2-2.  (Docket No. 511 at pp. 36-37.)

### e.  Certificates of Authenticity

A certificate of authenticity is prepared when a piece of artwork is sold.  (Docket No. 511 at p. 42.)  If the artist is alive, he or she prepares the certificate.  Id.  Because Victor Vasarely is not alive, defendant Vasarely prepares certificates of authenticity for his works of art that do not have original certificates.  Id.  Vasarely includes on the certificates the work's title, size, and date, as well as the location of the artist's signature.  (Docket No. 512 at pp. 28-29.)  To prepare a certificate, Vasarely needs a photograph of the front of the work, a photograph of the back of the work, and a close-up photograph of

the signature on the work.  Id. at p. 26; Def. Ex. J.  Vasarely

keeps a log of the certificates of authenticity that she issues,

and she is very serious about this matter.  (Docket No. 412 at p.

25; Docket No. 512 at p. 32; Joint Ex. LXVIII.)

        For five paintings that plaintiffs sold to Leyba -

*Kerhon*, *Tri-Veg*, *Separam*, *Emotta*, and *Bela-IBV* - Vasarely did not

deliver certificates of authenticity immediately upon receiving

payment from plaintiffs.  (Docket Nos. 507 at p. 75; 511 at pp. 40,

43.)  Plaintiff Rojas did not take close-up photographs of these

works before delivering them to Leyba's clients.  (Docket No. 412

at p. 26.)  Vasarely did not have physical custody of the paintings

before plaintiffs sold and delivered them to the clients, nor did

she have close-up photographs of the works.  (Docket No. 512 at pp.

27-28, 35-36, 44-45.)

        Beginning around September 2013, Vasarely

communicated directly with Leyba to describe the missing

information and close-up photographs that she needed to issue

certificates of authenticity.  See Docket No. 512 at pp. 42-43;

Joint Exs. XX-XXIII; Pls. Ex. 59; Def. Exs. L-O.  After receiving

the necessary information from Leyba, Vasarely sent complete

certificates of authenticity for *Kerhon*, *Tri-Veg*, *Separam*, *Emotta*,

*Bela-IBV*, and *Triton*.  (Docket No. 412 at p. 26.)  Leyba confirmed

that he received the certificates on February 27, 2014.  Id.; Joint

Ex. XXIV.

          Leyba testified that the delay in delivery of the

certificates did not affect his clients or cause any sale to be

lost.  (Docket No. 511 at pp. 45-48, 79-81.)

### 5.   Vasarely's Demands for the Return of her Artwork

          Sometime after Vasarely moved to Puerto Rico in October

2012, she began to realize that Rojas was taking artwork from her

storage without her permission.  (Docket No. 510 at p. 44.)  She

testified that "Rojas would serve himself from my storage.  He had

the keys to the storage. . . .  He would simply take the works of

art that he wanted, and I would never see anything."  Id.

          On March 14, 2013, Vasarely emailed Rojas requesting that

he give her the keys to her storage and a list of the works of art

that he took from her storage.  (Def. Ex. B.)  Rojas did not give

Vasarely the requested keys or list.  (Docket No. 510 at pp. 32-33,

48.)

          On April 7, 2013, Vasarely emailed Rojas airing her

personal and professional grievances with him.  (Def. Ex. C.)  In

the e-mail, Vasarely wrote:  "I no longer want to work with you,

you don't do anything, other than abuse me and take away my fortune

by Force [*sic*]."  Id.

Between May and October 2013, Vasarely wrote several emails to Rojas requesting that he return to her the keys to her storage and all of the artwork that belongs to her. <u>See</u> Def. Exs. D-H, K, GG, HH, LL. In one of these emails, dated May 16, 2013, Vasarely wrote: "If tomorrow prior to my leaving at one, all of my works of art have not arrived, I forewarn you that we are going to file a complaint in court and of course I am going to cancel all pending projects." (Def. Ex. F.) The next day, Vasarely asserted to Rojas in an e-mail: "We are not going to have any business until everything is clarified with attorneys and all my works of art are in my possession." (Def. Ex. G.)

When Rojas filed this suit against Vasarely on October 9, 2013, he had in his possession and under his control at least thirty-one works of art[7] that belonged to Vasarely. <u>See</u> Docket No. 412 at p. 28; Docket No. 505 at pp. 6-7; Def. Ex. A. At least one of these works, *Keiho-MC*, is listed in Appendix A of the 2010 Artwork Agreement as being consigned to plaintiffs pursuant to the Agreement. <u>See</u> Def. Ex. A; Joint Ex. I. Rojas estimates that the thirty-one works are worth over $10,000,000 in private sales and close to $3,000,000 in auction sales. (Docket No. 412 at p. 28.)

_____

[7] Twenty-five of the works are by Victor Vasarely, five are by Yvaral, and one is by Melvin Martinez. (Docket No. 3-1.)

Rojas returned the thirty-one works to Vasarely in February 2014 pursuant to the Court's order.  (Docket No. 505 at pp. 6-7.)

Rojas testified that the reason he did not return the works to Vasarely sooner was because plaintiffs were "still doing business with . . . the clients" and because "many" of the works "had been reserved" and "were already set to close."  (Docket No. 505 at p. 11.)

## B.   Legal Conclusions

Pursuant to Puerto Rico law, when a party breaches a contractual obligation, that party is liable for the losses and damages caused by the breach.  P.R. Laws Ann. tit. 31, § 3018.

Here, plaintiffs and defendant Vasarely agree that the 2010 Artwork Agreement is a valid contract.  The parties allege various breaches of contractual obligations arising out of the 2010 Artwork Agreement, and the Court now determines the merits of these claims.

### 1.   Plaintiffs' Claim - Reduced Commission

Plaintiffs claim that Vasarely breached the 2010 Artwork Agreement by reducing plaintiffs' commission to below 20%.

The only sales for which plaintiffs received a commission below 20% were auction sales in 2011 and 2012.  These auction sales were not governed by the 2010 Artwork Agreement.  Instead, plaintiffs and Vasarely made a separate agreement pursuant to which plaintiffs would earn 15% or 12% commission for auction sales.

Plaintiffs received all commissions that they were owed for these sales.

The Court finds in favor of defendant Vasarely for plaintiffs' breach of contract claim related to reduced commissions.  The Court **DISMISSES** this claim.

### 2.  **Plaintiffs' Claim - Halted Leyba Sales**

Plaintiffs claim that Vasarely breached the 2010 Artwork Agreement by halting certain sales to art dealer Leyba. Specifically, plaintiffs allege that Vasarely agreed to sell the twenty-eight works of art listed in Docket No. 2-2, including the 1950 *Zebres*, at certain prices and that after plaintiffs sold or "earmarked" for sale those pieces, Vasarely arbitrarily increased their prices or refused to sell them.

Leyba's clients never reserved or offered to purchase the twenty-eight works of art listed in Docket No. 2-2, including the 1950 *Zebres*.  Vasarely did not interfere with any sale to Leyba or cause any sale to fall through.  The clients simply lost interest after purchasing *Triton*, and Leyba decided not to encourage more sales because he did not want his clients to get involved in the current litigation initiated by plaintiffs.

The Court finds in favor of defendant Vasarely for plaintiffs' breach of contract claim related to the halted sales to Leyba.  The Court **DISMISSES** this claim.

### 3.    Plaintiffs' Claim - Certificates of Authenticity

Plaintiffs claim that Vasarely breached the 2010 Artwork Agreement by delaying delivery of certificates of authenticity for *Kerhon*, *Tri-Veg*, *Separam*, *Emotta*, *Bela-IBV*, and *Triton*. Plaintiffs' claim fails for several reasons.

First, a contractual obligation subject to a condition is not enforceable until the condition is met.   P.R. Laws Ann. tit. 31, § 3042.   Here, Vasarely's contractual obligation to deliver the certificate of authenticity for a work of art was conditioned on receiving her full portion of the sale price of the work.  As the Court will discuss below, see infra Section I. B. 5., Vasarely did not receive full payment for her portion of the sales of *Kerhon*, *Tri-Veg*, *Separam*, *Emotta*, *Bela-IBV*, and *Triton*, which were sold through Leyba.   Rather, plaintiffs concealed from Vasarely the true sale prices of the works and instead gave Vasarely 80% of the lower "base prices."  Thus, because she did not receive payment in full, she was not contractually required to deliver the certificates of authenticity.

Second, it is a "general principle of contract law that if one party to a contract hinders, prevents or makes impossible performance by the other party, the latter's failure to perform will be excused."  13 Williston on Contracts § 39:3 (4th ed.) (2016).  Here, plaintiffs made it impossible for Vasarely to

Civil No. 13-1766 (FAB)                                          22

deliver certificates of authenticity immediately after the six
works were sold because plaintiffs did not take close-up
photographs of the works before delivering the works to the
clients.    Vasarely needed these photographs to make the
certificates.   It took Vasarely several months of communication
back and forth with Leyba to get the necessary information to
complete the certificates.   Plaintiffs cannot complain of a delay
that they themselves caused.

        Third, a breach of contract claim lies only when the
breach causes harm.   See P.R. Laws Ann. tit. 31, § 3018.   Here,
plaintiffs have not shown that Vasarely's delay in delivering
certificates of authenticity harmed them in any way.   Specifically,
Leyba testified that the delay in delivering certificates to his
clients had no effect on his clients' decisions not to purchase
more artwork from plaintiffs.

        The Court finds in favor of defendant Vasarely for
plaintiffs' breach of contract claim related to the delayed
delivery of certificates of authenticity.   The Court **DISMISSES** this
claim.

    **4.    Vasarely's Counterclaim – Campolieto Sale**

        Vasarely claims that plaintiffs breached the 2010 Artwork
Agreement by keeping more than 20% of the sale price of *Gestalt-
Rugo*.   Plaintiffs sold *Gestalt-Rugo* to Campolieto for $390,000.

Pursuant to clause 7 of the Agreement, plaintiffs were entitled to 20% commission, which is $78,000. Plaintiffs instead kept $94,000. This is $16,000 more than the amount to which they were entitled.

At the summary judgment stage, the Court found that plaintiffs owed Vasarely at least $12,000 for this breach and that whether they owe her more would be determined at trial. (Docket No. 408 at p. 31.) Partial judgment of $12,000 was entered in Vasarely's favor. (Docket No. 409 at p. 1.)

The Court finds in favor of defendant Vasarely for her breach of contract counterclaim related to the Campolieto sale. In addition to the $12,000 judgment already ordered, the Court **ORDERS** plaintiffs to pay Vasarely **$4,000**[8] for this breach.

**5.    Vasarely's Counterclaim - Leyba Sales**

Vasarely claims that plaintiffs breached the 2010 Artwork Agreement by paying her 80% of the "base price" (the price Leyba paid plaintiffs) instead of 80% of the higher "sale price" (the price clients paid Leyba).

Clause 7 of the Agreement provides that Vasarely shall receive 80% of the "sale price" of each work of art sold pursuant to the Agreement. At the summary judgment stage, the Court

---

[8] The judgment of $4,000 is the difference between $16,000 (the commission plaintiffs kept in excess of the $78,000 to which they were entitled) and $12,000 (the amount the Court ordered plaintiffs to pay for this breach at the summary judgment stage).

determined that as a matter of law, the term "sale price" in clause 7 is ambiguous in the context of sales made with a co-broker. (Docket No. 408 at pp. 7-9.)

Courts should interpret the terms of a contract "in relation to one another." P.R. Laws Ann. tit. 31, § 3475. If a contract term is ambiguous, "extrinsic evidence is admissible to prove the parties' intent." Wells Real Estate Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E., 615 F.3d 45, 54 (1st Cir. 2010). To determine the contracting parties' intent, courts should "consider the occasion, the circumstances, the persons involved, and the agreement they intended to negotiate." Ramirez, Segal & Latimer v. Rojo Rigual, 23 P.R. Offic. Trans. 156 (1989).[9] "[A]ttention must principally be paid to [the parties'] acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. tit. 31, § 3472.

Here, the Court finds that plaintiffs and defendant Vasarely intended for the term "sale price" to mean the price paid by the final purchaser if plaintiffs collaborate with an art dealer, like Leyba, to make a sale. First, the Agreement refers to the sale price as the price paid by "the purchaser" and "the client." Leyba did not play the role of purchaser or client. He did not buy the works with the intent to keep them or the hope of

---

[9] No pincite is available for this decision.

reselling them one day.  Rather, after identifying interested clients, Leyba worked closely with plaintiffs to sell Vasarely's works to those clients.  Instead of buying the works with his own money, Leyba received payment from the clients and transferred those funds to plaintiffs after deducting his commission.

Second, Rojas's actions subsequent to the Agreement support this determination of the parties' intent.  Rojas actively concealed from Vasarely his commission arrangement with Leyba.  He never disclosed to her the higher "sale prices," never delivered to her copies of the invoices, and led her to believe that the lower "base prices" were the prices that Leyba's clients paid.  Had the parties intended for Vasarely to receive 80% of the amount plaintiffs received after a co-broker took up to 15% in commission, Rojas would not have concealed from Vasarely his commission arrangement with Leyba.

Third, Vasarely's actions subsequent to the Agreement support this intent.  When she finally learned of the commission arrangement in May 2013, she ended all business with plaintiffs and demanded that plaintiffs return all of her artwork.

Thus, the Court finds that pursuant to clause 7 of the 2010 Artwork Agreement, defendant Vasarely was entitled to 80% of the price paid by Leyba's clients for the sales that plaintiffs made through co-broker Leyba.  The clients paid Leyba a total of

Civil No. 13-1766 (FAB)                                              26

$2,676,500 for Vasarely's artwork.  Vasarely was entitled to 80% of
this amount, which is $2,141,200.  Vasarely instead received
$1,868,800.  Plaintiffs owe her the difference, which is $272,400.

        The Court finds in favor of defendant Vasarely for her
breach of contract counterclaim related to nonpayment for Leyba
sales.  The Court **ORDERS** plaintiffs to pay Vasarely **$272,400** in
damages for this breach.

### 6. **Vasarely's Counterclaim - Unauthorized Inventory**

        Vasarely claims that plaintiffs breached the 2010 Artwork
Agreement by keeping an unauthorized inventory of her artwork and
by refusing to return her artwork after she terminated the
Agreement.

        Pursuant to clause 3 of the Agreement, plaintiffs could
keep more than the original fourteen works only if the parties
amended the consignment list in writing.  Plaintiffs breached this
clause by taking and keeping several of Vasarely's works of art
without her permission.  Vasarely has not carried her burden for
this breach of contract claim, however, because she did not
establish that plaintiffs' breach caused her any harm or loss.  See
P.R. Laws Ann. tit. 31, § 3018.  Plaintiffs eventually returned the
artwork to Vasarely, upon the Court's Order, and there is no
evidence that Vasarely's lack of possession of her artwork for a
period of time caused any damage.

The Court finds in favor of plaintiffs for defendant Vasarely's breach of contract counterclaim related to plaintiffs' unauthorized inventory of her artwork.  The Court **DISMISSES** this claim.

### 7.    **Vasarely's Counterclaim - Contract Termination**

Vasarely claims that plaintiffs breached the 2010 Artwork Agreement by refusing to return her artwork after she terminated the Agreement.

Clause 11 of the Agreement provides that either party can terminate the Agreement for reasonable cause or for breach of contract with eight days' notice.  (Joint Ex. 1 at pp. 4-5.)  The Agreement does not prescribe how notice of termination must be provided.  Generally, "notice must be clear, definite, explicit, and unambiguous." Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 36 (1st Cir. 2008) (quoting Seaboard Sur. Co. v. Town of Greenfield, ex rel. Greenfield Middle Sch. Bldg. Comm., 370 F.3d 215, 223 (1st Cir. 2004)).

Here, after two months of repeatedly asking plaintiffs to return the artwork that they took and kept without her permission, Vasarely wrote to plaintiff Rojas warning him that she would cancel all pending projects if he did not return her artwork by the next day.  The next day, on May 17, 2013, Vasarely wrote an e-mail to

Civil No. 13-1766 (FAB)                                                    28

Rojas informing him that they were "not going to have any business"
until her works of art were returned.

        The Court finds that this was sufficient notice of
Vasarely's intent to terminate the Agreement.  It referenced the
cause for termination:  Rojas was in breach of the Agreement by
keeping an unauthorized inventory of her artwork.  Although it did
not refer to the Agreement by name, the notice was unambiguous
because the only "business" that Vasarely had with Rojas at that
time was artwork sales pursuant to the Agreement.  The notice was
also clear in the sense that it came after two months of repeated
warnings and complaints to plaintiffs that they were in breach of
the Agreement.

        Clause 12 provides that plaintiffs must return all
artwork to Vasarely within two days of the Agreement's termination
or pay Vasarely a $1,000 daily fine.  Puerto Rico law specifically
permits the use of "penal clauses" like this one.  See P.R. Laws
Ann. tit. 31, § 3131.  Penal clauses function "to guarantee the
performance of an obligation" and "to evaluate in advance the
damages which may be caused to [a party] by the improper
nonperformance of the obligation." Rochester Capital Leasing Corp.
v. Williams Int'l Ltd., 3 P.R. Offic. Trans. 226, 234 (1974)
(quotation marks and citation omitted).  Penal clauses also
"fulfill[] a coercive and punitive purpose." Id.  "As a remedy in

equity against the strictness or the excessive burden of the penal clause," Jack's Beach Resort, Inc. v. Compania de Turismo de P.R., 12 P.R. Offic. Trans. 430, 437 (1982), Puerto Rico law permits courts to "equitably modify the penalty," P.R. Laws Ann. tit. 31, § 3133.  This discretion "is broad but not unfettered," and courts consider the "balance between the punitive and remunerative functions of penal clauses" in exercising their discretion.  In re Alvarez, 473 B.R. 853, 863 (B.A.P. 1st Cir. 2012).

Vasarely gave notice of her intent to terminate the Agreement on May 17, 2013.  Pursuant to clause 11, the Agreement terminated eight days later and plaintiffs had two additional days to return Vasarely's artwork before triggering the stipulated daily fine.  Thus, the $1,000 daily fine started to accrue on May 28, 2013.  Plaintiffs returned the artwork to Vasarely 255 days later, on February 7, 2014, resulting in a $255,000 fine.  This penalty is not excessive considering that the estimated value of the artwork that plaintiffs kept was between three and ten million dollars.

The Court finds that a modification to the penalty is warranted, however, for another reason.  When plaintiffs brought this lawsuit on October 9, 2013, they moved to attach Vasarely's works that were in their possession in order to secure judgment.  See Docket Nos. 3, 14.  Vasarely then filed a counterclaim and moved to replevy many of the works.  See Docket Nos. 35, 47.  From

then on, the parties' dispute concerning the Agreement and Vasarely's works was properly before the Court. Therefore, the Court finds it equitable to toll the accrual of the daily penalty from the day that plaintiffs brought this suit. Accordingly, the court modifies the penalty to $134,000, which represents $1,000 per day for the 134 days that passed between May 28, 2013, and October 9, 2013.

The Court finds in favor of defendant Vasarely for her breach of contract counterclaim related to the termination of the 2010 Artwork Agreement. The Court **ORDERS** plaintiffs to pay defendant Vasarely **$134,000** in damages for this breach.

## II.  DEFAMATION CLAIM

Plaintiffs Rojas, Inart, and Inart Services claim that defendant Vasarely defamed them, causing damage to their commercial reputations.

### A.  Factual Findings

Beginning in May 2013, Vasarely repeatedly asked Rojas to return all of her artwork that was in his possession. For example, in an email dated May 16, 2013, Vasarely wrote: "If tomorrow prior to my leaving at one, all of my works of art have not arrived, I forewarn you that we are going to file a complaint in court." (Def. Ex. F.) The next day, Vasarely asserted to Rojas in an email: "We are not going to have any business until . . . all my

works of art are in my possession." (Def. Ex. G.)  On May 23,
2013, Vasarely again asked Rojas to return her artwork and warned
him that "not returning to me what is mine is called stealing."
(Def. Ex. GG.)  In an email dated June 2, 2013, Vasarely made clear
to Rojas that her works of art that he kept without her permission
and refused to return "had the status of stolen works." (Def. Ex.
HH.)  Vasarely told Campolieto and people at the administration
office of the condominium building where Vasarely and Rojas lived
that Rojas was a criminal who stole artwork from her. See Docket
No. 507 at pp. 96, 112.  Vasarely also told her assistant,
Mr. Daniel Domingo, that Rojas stole artwork from her during her
move to Puerto Rico. (Docket No. 509 at p. 19.)

On August 21, 2013, Vasarely reported to the Puerto Rico
Police that Rojas took thirty-three works of art valued at
$5,000,000 from her apartment. (Pls. Ex. 58.)  Vasarely also
reported to the FBI, the Guaynabo Police Department, and the
Bayamón Police Department that Rojas had stolen her property. See
Docket Nos. 507 at pp. 101-05; 517 at p. 38.

On October 10, 2013, Vasarely wrote an email to Leyba
informing him that she declared *Triton* stolen because Rojas took it
and sold it without her permission. (Pls. Ex. 60 at pp. 5-6.)
Leyba testified that the reason he stopped doing business with
Rojas was because this civil case was filed and because, despite

Civil No. 13-1766 (FAB)                                              32

Leyba's mediation efforts, Rojas and Vasarely could not resolve their dispute.  <u>See</u> Docket No. 511 at pp. 51, 56-57.

Rojas testified that Vasarely's statements "completely paralyzed" his business because he "specialize[s] in Vasarely" and can no longer sell Vasarely works.  (Docket No. 507 at p. 106.) Rojas's one project selling a non-Vasarely work of art was able to proceed after he met with the client and explained the situation. <u>Id.</u> at pp. 107-08.  Rojas chose to delay the sale of that work, however, until the proceedings in this case are over.  <u>Id.</u>

When Rojas filed this suit in October 2013, he had in his possession and under his control thirty-one works of art that belong to Vasarely.  <u>See</u> Docket No. 412 at p. 28; Docket No. 505 at pp. 6-7; Def. Ex. A.  Rojas estimates that these works are worth over $10,000,000 in private sales and close to $3,000,000 in auction sales.  (Docket No. 412 at p. 28.)  Rojas returned the works to Vasarely on February 7, 2014, pursuant to the Court's order.  <u>See</u> Docket Nos. 114; 118; 505 at pp. 6-7.

B.   **Legal Conclusions**

Pursuant to Puerto Rico law, "a private plaintiff asserting a defamation claim against a private defendant must show that the defendant (1) made a false statement, (2) in a negligent manner, (3) causing actual damage to the plaintiff."  <u>Baltodano v. Merck,</u>

Sharp & Dohme (I.A.) Corp., 637 F.3d 38, 43 (1st Cir. 2011) (noting
that Puerto Rico defamation laws follow the common law tradition).

Plaintiffs base their defamation claim on Vasarely's
statements to various people that Rojas stole artwork from her.  To
satisfy the first element, plaintiffs must prove that these
statements were false.  Plaintiffs have not carried this burden.
Vasarely made clear to Rojas, beginning in May 2013, that he did
not have permission to have her artwork.  When Rojas brought suit
in October 2013, he admitted to having thirty-one works of art that
belonged to Vasarely.  Because plaintiffs did not show that Rojas
had permission to take and keep Vasarely's artwork, they did not
prove that Vasarely's statements that Rojas stole her artwork was
false.

The Court finds in favor of defendant Vasarely for plaintiffs'
defamation claim.  The Court **DISMISSES** this claim.

### III.   *POMPARI* AND *QUASAR-ZETT* CLAIM

Plaintiff Rojas claims that defendant Vasarely breached a
verbal agreement by not giving Rojas certificates of authenticity
for the works of art titled *Pompari* and *Quasar-Zett*.

### A.   Factual Findings

In 2011, Rojas and Vasarely made a verbal agreement pursuant
to which Rojas would travel to Paris, France, for five days to
complete various tasks for Vasarely.  See Docket Nos. 412 at p. 35;

506 at p. 49; 507 at pp. 113-14.  Vasarely gave Rojas a list of
these tasks as well as a list of paintings that she wanted him to
find in her storage facilities in Paris and prepare for shipment to
Puerto Rico.  See Joint Ex. XCIV; Pls. Ex. 57; Docket No. 507 at
pp. 115-24.  As compensation, Vasarely would give Rojas two small
works of art that they would select as well as the works'
corresponding certificates of authenticity.  (Docket No. 507 at
pp. 124-25.)

Rojas was in Paris December 12-16, 2011.  (Docket No. 412 at
p. 35.)  During his stay, Rojas went to storage facilities where
Vasarely kept hundreds of paintings by Victor Vasarely and Yvaral.
(Docket No. 507 at p. 114.)  Pursuant to Vasarely's instructions,
Rojas removed dozens of works of art and prepared them to be
shipped to Puerto Rico.  Id. at p. 115.  He also contacted a
shipping company and communicated to its employees Vasarely's
specific instructions for moving hundreds of paintings from one
storage facility to another.  Id. at pp. 114, 116-17.  Rojas
supervised this move and completed other minor tasks for Vasarely,
including picking up jewelry and documents.  See id. at pp. 114,
117, 124.

The two works of art that Vasarely and Rojas selected as
Rojas's compensation for this job were *Pompari* and *Quasar-Zett*.
(Docket No. 507 at pp. 124-25.)  Rojas received these works when

Vasarely came to Puerto Rico in October 2012, (Docket No. 506 at p. 50), but Rojas never received the corresponding certificates of authenticity, (Docket No. 507 at p. 125).  Rojas estimates that together *Pompari* and *Quasar-Zett* are worth between $240,000 and $300,000.  (Docket No. 506 at p. 47.)

Vasarely testified that she never agreed to give Rojas *Pompari* and *Quasar-Zett* in exchange for the work that he did for her in Paris.  (Docket No. 517 at p. 34.)  She testified that Rojas was going to Paris for his own business and that she asked him to do some chores for her while he was there as a small favor between friends.  Id. at p. 32.  According to Vasarely, the preparation of the works of art to be shipped to Puerto Rico should have taken Rojas twenty minutes.  Id.  Vasarely testified that *Pompari* and *Quasar-Zett* together are worth between $350,000 and $380,000,[10] and that the minimal work that Rojas did for her in Paris was worth less than $5,000.  See id. pp. 33-34.

The Court does not credit Vasarely's testimony and finds Rojas's testimony more credible in this regard.  First, finding and preparing for shipment the several dozen paintings that Vasarely indicated in her list, see Joint Ex. XCIV; Pls. Ex. 57, is a task

---

[10] In a different context on a different day of trial, Vasarely testified that *Pompari* and *Quasar-Zett* were worth $160,000 each. (Docket No. 514 at pp. 83-84.)

that would have taken much longer than twenty minutes.  Second, although compensation valued at around $350,000 for five days of work seems incredible, supervising the move of hundreds of valuable Victor Vasarely and Yvaral works was a job that Vasarely considered extremely important.  Days before the trip, Vasarely wrote to Rojas warning him to be "extremely focused" when in France and to not make "any mistakes" because "the price to pay for those mistakes" could be "very heavy."  See Joint Ex. XCIII at p. 3.

**B.   Legal Conclusions**

Pursuant to Puerto Rico law, a contract has three elements: a definite and legal object, consideration, and consent.  P.R. Laws Ann. tit. 31, § 3391; Citibank Glob. Mkts., Inc. v. Rodriguez Santana, 573 F.3d 17, 24 (1st Cir. 2009).  Verbal contracts are valid and enforceable.  See P.R. Laws Ann. tit. 31, § 3451.  But see id. § 3453 (enumerating certain types of contracts, not present here, that have additional requirements regarding form).  When a party to a contract does not fulfill his or her obligations, the aggrieved party has the right to seek specific performance.  Id. § 3052.

The Court finds that Rojas and Vasarely entered into a valid contract:  its object was Rojas's performance of various tasks for Vasarely in Paris;  its consideration was Rojas's receipt of *Pompari*, *Quasar-Zett*, and the works' certificates of authenticity;

and the parties verbally consented to the agreement.  Rojas upheld
his end of the bargain by completing the tasks in Paris.  Although
Vasarely surrendered *Pompari* and *Quasar-Zett*, she did not surrender
certificates of authenticity for the works.  Rojas is entitled to
those certificates.  See P.R. Laws Ann. tit. 31, § 3052.

The Court finds in favor of plaintiff Rojas for his breach of
contract claim concerning delivery of certificates of authenticity
for *Pompari* and *Quasar-Zett*.  The Court **ORDERS** defendant Vasarely
to deliver to plaintiff Rojas complete certificates of authenticity
for *Pompari* and *Quasar-Zett*.

### IV.   BREACH OF AGENCY AND DEPOSITUM CONTRACTS COUNTERCLAIM

Defendant Vasarely claims that plaintiff Rojas breached agency
and depositum contracts[11] when he assisted with the shipment of
Vasarely's belongings from Chicago to Puerto Rico.

### A.   Factual Findings

Vasarely moved from Chicago to Puerto Rico in October 2012.
(Docket No. 517 at p. 36.)  As part of this move, Vasarely shipped
a substantial amount of personal belongings, including artwork.

---

[11] Defendant Vasarely uses the terms "mandate" and "consignment" to
describe the contracts.  See Docket No. 412 at pp. 18-19.  The
Puerto Rico Civil Code provisions that she relies on for these
claims, however, use the terms "agency" and "depositum."  See id.;
P.R. Laws Ann. tit. 31 §§ 4421, 4621.  The Court uses the terms
"agency" and "depositum" to be consistent with the Puerto Rico
Civil Code.

(Docket No. 412 at p. 32.)  Vasarely testified that Rojas agreed to "take care of everything" for her move to Puerto Rico and the shipment of her belongings.  (Docket No. 512 at pp. 102-03.)

Rojas hired a company to pack and ship Vasarely's things in Chicago.  See Docket No. 512 at p. 104.  Vasarely oversaw a representative from this company, Mr. Bill Mamer ("Mamer"), pack the things in her Chicago apartment.  Id. at pp. 103-04; Docket No. 516 at pp. 26-27.  Rojas oversaw Mamer pack items that Vasarely kept in four Chicago storage warehouses.  See Docket Nos. 512 at p. 105; 520 at pp. 79-83.

Vasarely did not write down an inventory of the items that were packed and shipped, (Docket No. 516 at pp. 49-53), and she did not ask Rojas to perform an inventory of the items shipped from her Chicago storage warehouses, (Docket No. 520 at p. 83).  The shipping company's packing lists give very general descriptions of the items packed.  See Joint Exs. XXXIV-XXXVIII.  For example, one packing list describes the container's contents as fifteen clothing items, five linen items, ten kitchenware items, and ninety ceramic and metal statues.  (Joint Ex. XXXIV.)

Five containers filled with hundreds of boxes of Vasarely's goods were shipped from Chicago to Puerto Rico.  See Docket Nos. 412 at pp. 32-33; 508 at p. 7.  Even though Vasarely instructed Rojas to put the shipments under her name, (Docket

No. 512 at p. 114), the containers were registered under various misspellings of "Luis Rojas," (Docket No. 412 at pp. 32-33).

Rojas received the five containers in Puerto Rico on September 19, September 20, October 12, December 14, and December 20, 2012. Id. He unloaded them at La Cima (a condominium building where both Rojas and Vasarely lived) and at a storage facility. See Docket No. 412 at pp. 32-34. Even though Vasarely instructed Rojas to lease the storage units in her name, (Docket No. 517 at p. 14), he leased them in his and his company's names, (Docket No. 412 at p. 34). Rojas hired two assistants to help him unload and move the items. (Docket No. 508 at p. 105.)

A sixth container filled with Vasarely's belongings was sent from Chicago to a storage facility in New Jersey, where it was unloaded and divided into two smaller containers. (Docket No. 412 at p. 33.) Rojas explained that the reason the container was sent to New Jersey was because Vasarely was moving from a large apartment in Chicago to a small apartment in Puerto Rico, and everything would not fit in the small apartment. (Docket No. 520 at p. 85.) Vasarely and Rojas negotiated free storage at the New Jersey facility, and Vasarely was storing items purchased at auctions there. Id. The plan was to keep the two containers and the auction items in New Jersey until Vasarely moved into her larger apartment in Puerto Rico. Id. at pp. 85-86. Vasarely

received the two containers in Puerto Rico in June 2013. (Docket No. 412 at p. 33.)

In June and July of 2013, when Vasarely moved to the larger apartment in La Cima, she realized that she was missing many of her belongings. (Docket Nos. 510 at p. 36; 512 at p. 109.) Vasarely identified with color photographs dozens of pieces of furniture and antiques that she claims are missing. (Def. Ex. W; Docket No. 514 at pp. 6-22.) She estimates that these things are worth between $600,000 and $700,000. (Docket No. 514 at p. 22.) She also claims to be missing Victor Vasarely paintings worth about $4,115,000, Yvaral works worth about $1,000,000, and dozens of smaller works worth about $1,656,000. See id. at pp. 81-90, 98; Def. Ex. III.

## B.   Legal Conclusions

### 1.   Agency Contract

Article 1600 of the Puerto Rico Civil Code provides that an agency contract is a contract in which a person (the agent) "binds himself to render some service, or to do something for the account or at the request of another" person (the principal). P.R. Laws Ann. tit. 31, § 4421. An agency contract "may be express or implied," id. § 4422, and the agent is presumed to perform his or her services gratuitously, id. § 4423. In fulfilling his or her obligations, the agent must "follow the instructions of the principal," id. § 4442, and is "liable for the losses and damages

caused to the principal through [the agent's] noncompliance," id.
§ 4441.

The Court finds that Vasarely and Rojas formed an agency
contract pursuant to which Rojas would (1) hire a company to pack
Vasarely's belongings in Chicago and to ship them to Puerto Rico,
(2) lease storage units in Puerto Rico, and (3) unload and store
Vasarely's belongings in Puerto Rico.    Vasarely specifically
instructed Rojas to ship the items and lease the storage units in
her name, but Rojas did not follow this instruction.   The Court
finds that this was Rojas's only breach of the agency agreement and
that he fulfilled all other obligations.

Vasarely has not carried her burden of proving that this
single breach caused any loss to her.   There is no evidence that,
for example, the fact that the shipments and storage units were not
in her name prevented her from communicating with the shipping
company, receiving the containers, or accessing the storage units.
There is also no evidence from which the Court could conclude that
this breach caused items to be lost.

The Court finds in favor of plaintiff Rojas for defendant
Vasarely's breach of agency contract counterclaim.   The Court
**DISMISSES** this claim.

**2.   Depositum Contract**

Pursuant to the Puerto Rico Civil Code, a depositum contract is "a contract whereby one person (the depositor) hands a piece of personal property to another person (the depositary) for the sole purpose of having the depositary keep, conserve, and return the property." Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 12 (1st Cir. 2005). The depositary is presumed to perform his or her services gratuitously "unless there is an agreement to the contrary." P.R. Laws Ann. tit. 31, § 4641. A depositum contract is constituted "from the time [the depositary] receives a thing belonging to [the depositor] with the obligation of keeping and returning it." Id. § 4621; see Jewelers Mut. Ins., 410 F.3d 2 at 13 (noting that the Puerto Rico Supreme Court focuses on whether the depositary received the thing to determine whether the parties formed a depositum contract).

The depositary must safeguard the deposited items "with the diligence pertaining to a good father of a family." See id. §§ 3021, 4661; Jewelers Mut. Ins., 410 F.3d 2 at 14-15 (explaining that the Puerto Rico Supreme Court interprets the "good father" standard as one of exercising "the proper diligence, which generally should be that which an average or normal type of diligent person would have exerted" (quoting Am. Sec. Ins. Co. v. Ocasio, 102 P.R. Offic. Trans. 207, 212 (1974)) (internal quotation

marks omitted)).   The depositary must return the items to the depositor "when required," P.R. Laws Ann. tit. 31, § 4661, and the depositary is liable "for the losses and damages caused" by his or her "fraud, negligence, or delay," id. §§ 3018, 4661.

The Court finds that a depositum contract was formed when Rojas received the five containers filled with Vasarely's belongings.   Pursuant to Vasarely's instructions, upon receiving the containers, Rojas stored their contents at La Cima and in leased storage warehouses.   Vasarely has not demonstrated that Rojas failed to exercise proper diligence and care in handling and keeping these items.   Further, Vasarely has not proven that the items that she claims are missing were received by Rojas because the five containers' contents were never inventoried.   Therefore, she has not proven that Rojas failed to return deposited items because she has not demonstrated which specific items were deposited.   Thus, Vasarely's has failed to prove her breach of depositum contract claim concerning the five containers.

The Court finds that a depositum contract was not formed between Vasarely and Rojas when the sixth container was shipped from Chicago to New Jersey.   The container's contents remained at the New Jersey storage facility until Vasarely received them in Puerto Rico.   Rojas never received the container or its contents, and receipt of the thing deposited is a requirement for the

formation of a depositum contract.  <u>See</u> P.R. Laws Ann. tit. 31,
§ 4621.

The Court finds in favor of plaintiff Rojas for defendant
Vasarely's breach of depositum contract counterclaim.  The Court
**DISMISSES** this claim.

## V.  CHICAGO CONDOMINIUM COUNTERCLAIM

Defendant Vasarely claims that plaintiff Rojas negligently and
in bad faith undersold her property at 910 S. Michigan Street,
Unit 1904, Chicago, Illinois ("the Chicago condo"), causing her to
suffer a loss of $335,000.

## A.  Factual Findings

In 2003-2004, the Chicago condo was purchased in Rojas's name
for $1,160,000.  (Docket No. 412 at p. 31.)  The property was
remodeled for an additional $250,000.  <u>Id.</u>  On September 3, 2010,
Rojas signed a "Memorandum of Note" pursuant to which the net
proceeds of the sale of the Chicago condo would be paid to
Vasarely.  <u>Id.</u> at p. 32.  Around November 2010, the condo was put
up for sale.  (Docket No. 520 at p. 92.)  During this time,
Vasarely handled the sale directly with a realtor.  <u>Id.</u> at p. 93.
Vasarely received some offers:  Rojas recalled one offer for
$950,000, and Vasarely recalled another offer for $1,100,000.  <u>See</u>
<u>id.</u> at p. 95; Docket No. 517 at p. 49.  Vasarely did not accept the

offers because she thought that they were too low, and she took the condo off the market.  (Docket No. 516 at p. 77.)

After Vasarely moved from Chicago to Puerto Rico in October 2012, Rojas took over handling the sale of the Chicago condo.  See Docket No. 517 at pp. 36, 49-50.  He hired a realtor and suggested to Vasarely that they sell the condo for $1,100,000.  Id. at p. 50. She disagreed, arguing that $1,100,000 was too low and that an appraisal needed to be done.  Id.  Nonetheless, Rojas sold the Chicago condo without an appraisal for $1,075,000 on April 15, 2013.  (Docket No. 412 at p. 32.)

**B.   Legal Conclusions**

Pursuant to Puerto Rico law, when a party is "guilty of fraud, negligence, or delay" in fulfilling its contractual obligations, the aggrieved party is entitled to the "losses and damages" caused by the fraud, negligence, or delay.  P.R. Laws Ann. tit. 31, § 3018.

The Court finds that Vasarely has not carried her burden on this counterclaim because she did not prove that she suffered any loss or damage caused by Rojas's sale of the Chicago condo for $1,075,000 in April 2013.  The only evidence Vasarely presented to show the value of the condo in April 2013 was the condo's 2003-2004 purchase price ($1,160,000) and the additional value of its renovations ($250,000).  As the Court explained at the summary

judgment stage, the value of a piece of real estate is not necessarily equal to its purchase price from a decade prior plus the value of its renovations. See Docket No. 408 at p. 29. Other factors can affect a property's value. Vasarely concedes in her proposed conclusions of law that "[w]ithout . . . an appraisal, it is impossible to know whether Rojas sold the property under value, at value[,] or above value." (Docket No. 525-2 at p. 46.) Because Vasarely did not present evidence from which the Court could conclude that Rojas sold the Chicago condo for less than it was worth, she has not proven that she suffered any loss.

The Court finds in favor of plaintiff Rojas for defendant Vasarely's counterclaim related to the alleged negligent sale of the Chicago Condo. The Court **DISMISSES** this counterclaim.

### VI.  TORT COUNTERCLAIM SEEKING DAMAGES FOR MENTAL ANGUISH

Defendant Vasarely claims that plaintiff Rojas's tortious acts caused her to suffer mental anguish since she arrived in Puerto Rico in 2012.

### A.  Factual Findings

Rojas encouraged Vasarely to move from Chicago to Puerto Rico. (Docket No. 510 at pp. 38-39.) He promised her that she was going to have a "new life" and that he would help and protect her. Id. at pp. 29, 38-39. Since Vasarely arrived in Puerto Rico in

October 2012, her life has been what she describes as "a nightmare" due to Rojas.  Id. at p. 39.

Sometime after Vasarely arrived in Puerto Rico, she began to realize that Rojas was taking artwork from her storage without her permission.  (Docket No. 510 at p. 44.)  On March 14, 2013, Vasarely emailed Rojas requesting that he give her the keys to her storage and a list of the works of art that he took from her storage.  (Def. Ex. B.)  Between May and October 2013, Vasarely wrote several emails to Rojas requesting that he return to her the keys to her storage and all of the artwork that belongs to her. See Def. Exs. D-H, K, GG, HH, LL.  The emails demonstrate that Vasarely was concerned, stressed, anxious, and upset.

Rojas ignored her repeated requests.  (Docket No. 110 at pp. 33-35.)  Instead, he kept at least thirty-one of Vasarely's works of art, worth between $3,000,000 and $10,000,000, until the Court ordered him to return them to Vasarely in February 2014. See Docket Nos. 412 at p. 28; 505 at pp. 6-7.  There was no valid justification for Rojas keeping these works.

When asked how Rojas's actions have affected her health, Vasarely testified as follows:  "I have [had] a very severe and irreversible illness for many years now.  There's no treatment, no surgery.  It's just pain all the time.  And it's written in the doctor's paper, and it's directly stress related.  So when there

isn't much stress, I can more or less get by.  But when there's stress, I cannot walk.  I have to stay in bed."  (Docket No. 517 at p. 60.)

Rojas was aware of Vasarely's illness.  In an email dated May 14, 2013, Vasarely explained to Rojas as follows:  "You know that I am seriously physically ill, with many risks, very emotionally damaged, and that the worst thing for me is stress."  (Def. Ex. FF.)

**B.   Legal Conclusions**

Article 1802 of the Puerto Rico Civil Code provides that a "person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31 § 5141.  To prevail in an Article 1802 claim, "a plaintiff must prove, by a preponderance of the evidence, the following elements:  (1) an act or omission constituting fault or negligence; (2) injuries; and (3) a causal connection between the act or omission and the injuries."  In re Caribbean Petroleum, LP, 561 F. Supp. 2d 194, 199 (D.P.R. 2008) (Besosa, J.) (citing Baco v. Almacen Ramon Rosa Delgado, Inc., 151 P.R. Dec. 711, 725 (2000)).

Puerto Rico law recognizes two types of recoverable damages: pecuniary or economic damages, and moral damages.  Rivera Colon v. Diaz Arocho, 165 P.R. Dec. 408, 428 (2005).  The Puerto Rico

Supreme Court defines moral damages as "the damage inflicted on the beliefs, feeling, dignity, social esteem, or physical or mental health of the injured party." Id. Determining moral damages does not depend "solely on material facts and purely objective evidence." Id. at 431. Rather, "it is an undertaking that tolerates a certain degree of speculation, inasmuch as it relies, to a greater extent than [economic] damages, on subjective factors such as the discretion, the sense of justice and the humane conscience of the trier of facts." Id.

Here, the Court finds that plaintiff Rojas acted with fault and negligence when he ignored defendant Vasarely's repeated requests to return her valuable artwork and the keys to the warehouses where she stored artwork and personal belongings. He had no right to keep the items. The Court also finds that Rojas's actions caused Vasarely to become extremely stressed and anxious. Even though Vasarely's emails put Rojas on notice that the stress he caused was exacerbating her physical condition, he did nothing right his wrongs. Instead of simply returning the things that belonged to her, Rojas brought this lawsuit against Vasarely.

The Court finds that Rojas owes Vasarely $5,000 in moral damages for the mental anguish that he caused her to suffer between March and October 2013.

The Court finds in favor of defendant Vasarely for her tort counterclaim.  The Court **ORDERS** plaintiff Rojas to pay Vasarely **$5,000** in moral damages.

### VII.  DEFENDANT VASARELY'S WRIT OF REPLEVIN

Defendant Vasarely moves to replevy dozens of works of art, furniture, and other items that she claims belong to her and are in the wrongful possession of plaintiff Rojas.  <u>See</u> Docket No. 412 at pp. 6-10.

### A.  Factual Findings

#### 1.  *La Bergere*

Vasarely provided an index card from her files that shows a color photograph of *La Bergere* and identifies the painting's title, size, and year.  (Def. Ex. DDD at p. 1.)

*La Bergere* is the first work that Victor Vasarely painted.  (Docket No. 512 at p. 83.)  He gave it to defendant Vasarely as a gift on the condition that it never be sold.  (Docket No. 514 at pp. 41-42.)  A letter from Victor Vasarely dated September 2, 1988, states that he gave Vasarely *La Bergere* as a gift.  (Def. Ex. DDD at p. 3.)

Rojas took *La Bergere* and refused to give it back to Vasarely.  (Docket No. 512 at pp. 83-85.)  Vasarely testified that Rojas took it "just to hurt [her]."  <u>Id.</u>  La *Bergere* was in Rojas's custody until April 8, 2015, when he deposited it in a storage

warehouse pursuant to the Court's Order and delivered the warehouse key to the Clerk of the Court.  (Docket No. 402.)

   **2.    *Pompari* and *Quasar-Zett***

        Vasarely provided index cards from her files that show color photographs of *Pompari* and *Quasar-Zett* and identify the paintings' titles, sizes, and years.  (Def. Ex. DDD at pp. 32-33.)

        As discussed above, <u>see</u> Section III. A., defendant Vasarely gave plaintiff Rojas *Pompari* and *Quasar-Zett* in exchange for work that he performed for her in Paris, France, in 2011.

        *Pompari* and *Quasar-Zett* were in Rojas's custody until April 8, 2015, when he deposited them in a storage warehouse pursuant to the Court's Order and delivered the warehouse key to the Clerk of the Court.  (Docket No. 402.)

   **3.    *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda***

        Vasarely provided index cards from her files that show color photographs of *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda*, and identify the paintings' titles, sizes, and years.  (Def. Ex. DDD at pp. 9-10, 35-37.)

        In 1981 and 1985, Dr. Luis Rojas (plaintiff Rojas's father) purchased a total of eleven Victor Vasarely paintings from an art gallery in Venezuela.  (Pls. Ex. 45.)  On September 2, 2002, Dr. Rojas gave custody of eight of these works, including *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda*, to plaintiff Rojas to exhibit

in international shows.  (Def. Ex. WWW.)  Dr. Rojas also gave
plaintiff Rojas "the right to sell or exchange" the works in
Dr. Rojas's name.  Id.  On September 25, 2002, Rojas consigned
these works to Vasarely "for exhibits or possible sale."  Id.

From 2008 to 2012, Vasarely was involved in a civil
lawsuit against Mr. Thomas Monahan ("Monahan") in Chicago,
Illinois.  See Docket No. 512 at p. 102; Pls. Ex. 64.  During that
litigation, the court took custody of hundreds of works of art that
Vasarely stored in Chicago.  See Docket No. 514 at p. 92, Pls.
Ex. 47.  Among the works seized were *Grilles II*, *Tridim-S*, and
*Tsoda*.  See Pls. Ex. 47.  On January 20, 2009, Vasarely wrote to
Dr. Rojas expressing that she regretted the situation with the
Monahan case and hoped that Dr. Rojas's works that were seized,
including *Grilles II*, *Tridim*, and *Tsoda*, would be returned to him
in March or April.  (Pls. Ex. 70.)

On September 22, 2010, Dr. Rojas and Vasarely signed an
agreement (the "September 2010 agreement") in which, among other
things, Vasarely recognized that Dr. Rojas was the owner of
*Grilles-II*, *Helios-Neg*, *Tridim-S*, and *Tsoda*.  (Joint Ex. LX at
pp. 1-2.)  Dr. Rojas currently claims that he owns these four
paintings.  (Docket No. 518 at pp. 66, 71, 73.)

Vasarely claims that she is the rightful owner of
*Grilles-II*, *Helios-Neg*, *Tridim-S*, and *Tsoda*.  She claims that on

February 5, 2009, she and Rojas signed an agreement (the "February 2009 agreement") pursuant to which Rojas gave her these four paintings, along with five others, to satisfy a debt that Rojas and his family owed to Vasarely.  See Def. Ex. UU; Docket No. 514 at pp. 63-64, 108-10; Docket No. 515 at pp. 33-34.  The nine paintings that Rojas allegedly gave Vasarely were works that Dr. Rojas had purchased from the Venezuelan art gallery in the 1980s.  See Pls. Ex. 45; Def. Ex. UU.  The alleged debt was from cash that Rojas and Dr. Rojas received from Dr. Zalduondo for sales of defendant Vasarely's artwork.  (Def. Ex. UU.)  Rojas denies that he signed the February 2009 agreement, (Docket No. 521 at p. 37), and Dr. Rojas claims that the agreement is "a total falsehood," (Docket No. 518 at pp. 76-79).

Vasarely alleges that she signed the September 2010 agreement because Rojas encouraged her to falsely represent to the Chicago court that Dr. Rojas owned the works that Rojas had given her in February 2009.  (Docket Nos. 514 at pp. 114-15; 522 at pp. 135-36.)  This way, the works listed in the September 2010 agreement that had been seized by the Chicago court would be returned to Dr. Rojas, and he would give them to Vasarely.  (Docket Nos. 514 at pp. 114-15; 522 at pp. 135-36.)

Vasarely estimates that *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda* are worth $400,000, $700,000, $350,000, and $400,000,

respectively.  (Docket No. 514 at pp. 82, 84.)   These four works
were in Rojas's custody until April 8, 2015, when he deposited them
in a storage warehouse pursuant to the Court's Order and delivered
the warehouse key to the Clerk of the Court. (Docket No. 402.)

    **4.   Sofa and Warhol Print**

       Vasarely provided a color photograph of an eighteenth-
century sofa that she claims belongs to her.  (Def. Ex. SS; Docket
No. 513 a pp. 35-37.)  Rojas took the sofa from Vasarely in 2009.
(Docket No. 513 at p. 37.)   In March 2009, Vasarely wrote an email
to Rojas asking him to return her furniture, including the sofa.
(Def. Ex. QQ; Docket No. 513 at pp. 38-39.)  Vasarely last saw the
sofa in Rojas's apartment in Puerto Rico.  (Docket No. 513 at
p. 37.)

       Vasarely also provided a color photograph of a Marilyn
print by Andy Warhol that she claims belongs to her.  (Def. Ex. NN;
Docket No. 513 at p. 45.)  Rojas took the print from Vasarely in
2009.  (Docket No. 513 at p. 45.)  Since 2009, Vasarely has asked
Rojas to return the print to her, but he refuses.  Id.; Docket
No. 522 at p. 137.   Vasarely last saw the print in Rojas's
apartment in November 2012.  (Docket No. 513 at p. 45.)

       Rojas testified that he has the sofa and the Warhol
print. (Docket No. 521 at p. 28.)

## B.   Legal Conclusions

Article 393 of the Puerto Rico Civil Code provides that "any person who has lost any movable property or has been illegally deprived thereof, may recover it from the person in possession of the same." P.R. Laws Ann. tit. 31, § 1479.  Similarly, Article 280 of the Puerto Rico Civil Code gives owners "a right of action against the holder and the possessor of the thing [that he or she owns] in order to recover it."  Id. § 1111.  Pursuant to these two articles, a petitioner seeking to replevy an object must (1) adequately identify the object, (2) prove that she owns it, and (3) prove that the opposing party improperly possesses it.  Ramirez Quiñones v. Soto Padilla, 168 P.R. Dec. 142, 157 (2006).  As to the second element, the owner must affirmatively prove her title to the property rather than merely argue that the opposing party lacks title.  Id.

Article 1868 of the Puerto Rico Civil Code imposes a one-year statute of limitations on replevin claims.  P.R. Laws Ann. tit. 31, § 5298(1).  The statute of limitations begins to run "at the time a reasonably diligent person would discover sufficient facts to allow her to realize that she'd been injured and to identify the party responsible for that injury."  Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 216 (1st Cir. 2016).

### 1.   *La Bergere*

Defendant Vasarely seeks to replevy *La Bergere*.  As to this work, Vasarely has established the three elements of her replevin claim.  First, she adequately identified the object by providing its title, size, and year, as well as a color photograph of it.  Second, she proved that she owns *La Bergere* through a letter from the artist that states that he gave it to her as a gift.  Third, she established that *La Bergere* was in Rojas's possession before the Court ordered him to deposit it in a storage warehouse, and that he did not have a right to possess it.

The Court **GRANTS** defendant Vasarely's writ of replevin as to *La Bergere*.

### 2.   *Pompari* and *Quasar-Zett*

Defendant Vasarely seeks to replevy *Pompari* and *Quasar-Zett*.  Vasarely has not established the second and third elements for this replevin claim.  As to the second element, she does not own the works because she gave them to Rojas as compensation for work that he did for her in Paris in 2011.  As to the third element, although Rojas had possession of the works before the Court ordered him to deposit them in a storage warehouse, Vasarely has not proven that his possession was improper.

The Court **DENIES** defendant Vasarely's writ of replevin as to *Pompari* and *Quasar-Zett*.

### 3.    *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda*

Defendant Vasarely seeks to replevy *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda*. Vasarely has not established the second and third elements for this replevin claim.

As to the second element, Vasarely's only proof that she owns the four works is an agreement that she claims was signed by her and Rojas in February 2009. Assuming that the February 2009 agreement is valid,[12] it was nonetheless superseded by the September 2010 agreement signed by Dr. Rojas and Vasarely in which Vasarely admits that Dr. Rojas owned the four works at that time. The Court does not credit Vasarely's testimony that the September 2010 agreement was drafted to make a false representation to the Chicago court. Thus, the September 2010 agreement establishes that Dr. Rojas owned the four works in September 2010, and Vasarely

---

[12] The Court seriously questions the validity of the February 2009 agreement that purports to give Vasarely title to nine paintings in exchange for the satisfaction of a debt that the Rojas family owed Vasarely. First, the agreement does not state or even estimate the amount of debt owed to Vasarely. The Court would expect this level of detail in an agreement effecting the transfer of nine valuable works of art. Second, Vasarely estimates that four of the nine works are worth $1,850,000. Vasarely presented no evidence to prove that the Rojas family owed her a debt that was anywhere near this high amount. Third, two weeks before the agreement was allegedly signed, Vasarely acknowledged in a letter to Dr. Rojas that she understood that he owned three of the nine works. The Court would expect Vasarely to require Dr. Rojas's signature on an agreement transferring title of these works just two weeks later, but only Rojas and Vasarely signed the agreement.

presented no evidence that she acquired title to the four works after September 2010.  Accordingly, the Court concludes that Vasarely has not proven that she owns *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda*.

As to the second element, although Rojas had possession of the four works before the Court ordered him to deposit them in a storage warehouse, Vasarely has not proven that his possession was improper.

The Court **DENIES** defendant Vasarely's writ of replevin as to *Grilles II*, *Helios Neg*, *Tridim-S*, and *Tsoda*.

### 4.   Sofa and Warhol Print

Defendant Vasarely seeks to replevy a sofa and a Warhol print.  Rojas raises a statute of limitations defense.  <u>See</u> Docket No. 528 at p. 86.  Since 2009, Vasarely has known that Rojas wrongfully possesses her sofa and Warhol print and has asked him to return the items.  Therefore, the one-year statute of limitations for Vasarely's replevin action as to these items began to run in 2009.  Vasarely waited until 2013 to bring her replevin claim.  <u>See</u> Docket Nos. 47, 47-2.  This is well outside the one-year limitations period.  Accordingly, Vasarely's replevin claim as to the sofa and Warhol print is time-barred.

The Court **DENIES** defendant Vasarely's writ of replevin as to the sofa and the Warhol print.

**5.    Other Artwork, Furniture, and Items**

Defendant Vasarely seeks to replevy nineteen additional Victor Vasarely paintings, thirty-eight Yvaral works, dozens of smaller pieces of artwork (including drawings and collages), various pieces of furniture and home decoration ornaments, and nine plastic boxes filled with documents. See Docket No. 412 at pp. 6-10; Def. Exs. W & DDD (color photographs of many of the works of art, pieces of furniture, and items that Vasarely seeks to replevy).  Vasarely has not established the third element for this replevin claim because she has not proven that plaintiff Rojas possesses these objects.

As to the works of art, Vasarely explained that she searched for them in her storage warehouses and could not find them. (Docket No. 514 at pp. 101-02.)  She believes that Rojas has them because he is the one that handled them during her move to Puerto Rico in 2012 and because she "can't see who else it could be" who has them. Id. at pp. 102-03.  As to the pieces of furniture, Vasarely testified that she last saw them in her apartment in Chicago when they were packed to be shipped to Puerto Rico.  (Docket No. 513 at p. 24.)  When Vasarely realized that she was missing many items after her move to Puerto Rico, Rojas did not help her locate them.  (Docket No. 513 at p. 22.)  Rojas testified

that he does not have these works, pieces of furniture, or other items.  (Docket Nos. 521 at pp. 28-29; 522 at pp. 56-57.)

The Court finds that Vasarely's speculations and scant circumstantial evidence are not enough to demonstrate, even by a preponderance of the evidence, that Rojas possesses the artwork, furniture, and items that she claims that she is missing.

The Court **DENIES** defendant Vasarely's writ of replevin as to the remaining artwork, furniture, and items that were not discussed above in Sections VII. B. 1-4.

### VIII.  CONCLUSION

After consideration of the evidence presented at trial and in light of the aforementioned findings of fact and conclusions of law, the Court **ORDERS** as follows:

1.    Judgment in favor of defendant Vasarely for her breach of contract counterclaim related to the Campolieto sale.  In addition to the $12,000 judgment previously ordered, plaintiffs shall pay Vasarely **$4,000** for this breach.

2.    Judgment in favor of defendant Vasarely for her breach of contract counterclaim related to nonpayment for Leyba sales. Plaintiffs shall pay Vasarely **$272,400** for this breach.

3.    Judgment in favor of defendant Vasarely for her breach of contract counterclaim related to the termination of the 2010 Artwork Agreement.  Plaintiffs shall pay Vasarely **$134,000** for this breach.

4.    Judgment in favor of plaintiff Rojas for his breach of contract claim concerning *Pompari* and *Quasar-Zett*.  Defendant Vasarely shall deliver to Rojas complete certificates of authenticity for *Pompari* and *Quasar-Zett*.

5.    Judgment in favor of defendant Vasarely for her tort counterclaim.  Plaintiff Rojas shall pay Vasarely **$5,000** in moral damages.

6.    Plaintiffs' remaining claims and defendant Vasarely's remaining counterclaims are **DISMISSED WITH PREJUDICE.**

7.    Defendant Vasarely's writ of replevin is **GRANTED** as to *La Bergere* and **DENIED** as to the remaining works of art, furniture, and items.  When the Court orders the Clerk of the Court to surrender the key to the warehouse where *La Bergere* is stored, Vasarely shall take possession of *La Bergere*.

8.    The Court **VACATES** the Order enjoining plaintiffs and defendant Vasarely from selling or moving artwork by Victor Vasarely and Yvaral.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, August 5, 2016.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE
